## IN THE NINTH JUDICIAL CIRCUIT COURT IN AND FOR
## OSCEOLA COUNTY, FLORIDA

Barbara Andreas, Stephen J.                    :
Cribb, Adam Pajer, Steven Gibbons,             :
Cheron Hayes, Cathryn Koepke, and              :
Seth Schmidt,                                  :
                                               :
   Plaintiffs,                  :  **CASE NO.: 2022-CA-001697**
vs.                                            :
                                               :
The Walt Disney Company, Disney Parks,         :
Experiences And Products, Inc., Reedy          :
Creek Improvement District, Walt               :
Disney Parks and Resorts U.S., Inc.,           :
Disney Gift Card Services, Inc., Disney        :
Human Resources Services Co., LLC,             :
Disney Vacation Club Management, LLC,          :
                                               :
   Defendants.                  :

_____

### FIRST AMENDED COMPLAINT
### AND DEMAND FOR JURY TRIAL

   COME NOW, by and through the undersigned attorneys, BARBARA ANDREAS, STEPHEN J. CRIBB, ADAM PAJER, STEVEN GIBBONS, CHERON HAYES, CATHRYN KOEPKE, and SETH SCHMIDT (hereinafter referred to collectively as "Plaintiffs"), and file this First Amended Complaint against Defendants, THE WALT DISNEY COMPANY, DISNEY PARKS, EXPERIENCES AND PRODUCTS, INC., REEDY CREEK IMPROVEMENT DISTRICT (also "RCID"), WALT DISNEY PARKS AND RESORTS U.S., INC., DISNEY GIFT CARD SERVICES, INC., DISNEY HUMAN RESOURCES SERVICES CO., LLC, and DISNEY VACATION CLUB MANAGEMENT, LLC (hereinafter referred to corporately as "Disney"), and allege as follows:

## **INTRODUCTION**

For nearly one hundred years, Disney has brought wonder and magic into the lives and homes of millions of children and adults all around the world.   It is unmatched in its ability to spin and retell beautiful tales of daring adventure, undying love, and triumph over monstrous villains.   What child didn't feel the grief of the Dwarves when the Evil Queen poisoned Snow White? Or close their eyes and feel that if they just believed enough, they could fly like Peter Pan? Or "wish upon a star" for their dreams to come true?

For Plaintiffs, Disney did make their dreams come true.   They each found their dream job as a part of Disney's cast and excelled in their work for the thousands of Disney guests they served. Disney has been for decades a preferred place to work, carefully creating and maintaining an environment of harmony and inclusion.   Disney's former CEO states proudly in the Employee Policy Manual:

I have had the privilege to work at The Walt Disney Company for more than 25 years and am honored to have the opportunity to serve as CEO. The Company has experienced a number of significant changes during my time here as we continually imagine and innovate. One thing that has not changed is our steadfast commitment to doing business in an ethical, trustworthy way that is beyond reproach.

We have an incredible collection of brands and content, but ultimately the character of our company comes from the energy and integrity of our people. Whether you are a long-time Disney employee or recently joined us, we must continue to hold ourselves to the highest standards, to do the right thing, to behave ethically and respectfully, and to represent and reflect this phenomenal company in the best possible way at all times.

Inclusion and belonging are key factors in how we conduct ourselves, and I expect every employee and Cast Member to work together to make the Company a place where everyone feels respected and valued for their unique stories and contributions to our businesses.

Our Employee Policy Manual details our current policies and principles and provides guidance and direction on issues we may face in today's ever-evolving workplace. I encourage you to review these policies and use them as you perform your valuable work for this company.

With sincere thanks for your commitment and passion,

Bob Chapek

Chief Executive Officer

The Walt Disney Company

But a shadow has come over Disney. For cast members like Plaintiffs who have strongly held religious beliefs, Disney has cast itself as the villain. In 2020, Disney's cast was rocked by the Covid-19 pandemic, but came together as Disney reopened its doors to guests and worked hard to make magic again. But, in only one year's time, by fall of 2021, Disney targeted cast members who declined Covid-19 vaccinations, including Plaintiffs who filed exemptions on grounds of religious faith, stating that taking these injections would violate their deeply held convictions.

Disney could and should have chosen to accommodate these religious beliefs in practice; indeed, to do so would have been to follow state and federal law, Disney's core principles and company policies, including its aspirational Five Keys. Instead, Disney imposed harsh,

unreasonable, and discriminatory "Augmented Health and Safety Protocols" enforced arbitrarily against Plaintiffs.   These protocols made clear that Disney irrationally feared Plaintiffs as somehow perpetually exposed or infectious with disease and a perpetual danger to other cast and guests.

When Plaintiffs each objected respectfully and consistently to Disney's unlawful discrimination against them, Disney failed to remediate its actions, contrary to law. Instead, Disney suspended and/or terminated Plaintiffs for "Speaking Up" in accordance with law and Disney's own company policy.

## <u>GENERAL ALLEGATIONS</u>

**Parties, Jurisdiction, and Venue**

1. At all times material hereto, Plaintiff Barbara Andreas was a resident of Indian River County, Florida and employed by Walt Disney Parks & Resorts, U.S., Inc.

2. At all times material hereto, Plaintiff Stephen Cribb was a resident of Orange County, Florida and employed by Disney Vacation Club Management, LLC.

3. At all times material hereto, Plaintiff Adam Pajer was a resident of Orange County, Florida and employed by Walt Disney Parks & Resorts, U.S., Inc.

4. At all times material hereto, Plaintiff Steve Gibbons was a resident of Orange County, Florida and employed by Walt Disney Parks & Resorts, U.S., Inc.

5. At all times material hereto, Plaintiff Cheron Hayes was a resident of Orange County, Florida and employed by Disney Gift Card Services, Inc.

6. At all times material hereto, Plaintiff Cathryn Koepke was a resident of Lake County, Illinois and employed by Disney Human Resources Services Co., LLC.

7. At all times material hereto, Plaintiff Seth Schmidt was a resident of Osceola County, Florida

and employed by Walt Disney Parks & Resorts, U.S., Inc.

8.  **The Walt Disney Company** was organized in Delaware, is headquartered in Burbank, California, and is doing business in Florida, particularly in Orlando and Osceola counties, through its wholly-owned subsidiaries, *inter alia* Defendants: **Disney Parks, Experiences, and Products, Inc.**, a California corporation organized in current form in 2008 and registered in Florida; **Walt Disney Parks and Resorts U.S., Inc.,** a Florida corporation organized in 1997; **Disney Gift Card Services, Inc.**, a Virginia corporation organized in 2013, registered in Florida; **Disney Human Resources Services Co., LLC**, a California limited liability company organized in 2014, registered in Florida; and **Disney Vacation Club Management, LLC**, a Florida limited liability company reorganized in 2017.

9.  **Reedy Creek Improvement District** is a local government *special district* established in 1967 by H.B. 486, Chapter 67-764, and carries out local government functions exclusively under Disney authority on Disney's property located within Orange and Osceola counties.

10. This Court has jurisdiction over Plaintiffs' state and federal claims under Fl. Stat. § 26.012 and pursuant to Fl. Stat. § 448.103, § 760.11(4), and § 86.011 under which Plaintiffs bring their claims.

11. This Court has personal jurisdiction over Defendants in this matter, as all Disney entities herein named Defendants are either Florida corporations or deemed a resident foreign company that conducts its main business in Osceola and Orlando counties; and RCID, as a statutorily created special "district" local government, is subject to the jurisdiction of Florida courts, through which Disney corporately is also a local Florida governmental entity, subject to the jurisdiction of Florida courts.

12. Venue under Fl. Stat. § 47.011 is proper in this Court as the acts giving rise to Plaintiffs'

cause of action exist and/or occurred in Osceola County, Florida.

13. All conditions precedent to this action have occurred, have been performed, or have been waived.

**Common Background Facts**

***Disney's Covid-19 vaccine mandate***

14. When the national state of emergency over the Covid-19 pandemic was announced, Disney closed temporarily beginning March 15, 2020, and reopened less than four months later.

15. Upon reopening, Disney's safety protocols for Covid-19 included use of double face masks then acceptable by the CDC (cloth accepted) and social distancing by cast members and guests.   For only certain cast, face shields or goggles might be required based on proximity to guests.

16. Cast who were feeling sick or who tested positive for Covid-19 were to isolate at home for five days or until the end of symptoms; wear facial covering at work for an additional five days and socially distance by 6 feet when removing facial covering; and report Covid-19 in the HR cast member portal (as well as to DPEP.Contact.Tracing@disney.com if they reported sick due to positive test).   Those who were "unable to wear a face covering while working" were required to stay at home and not report to work for ten days following exposure or until after symptoms ceased.   **Exhibit A**[1]

17. On July 30, 2021 Disney announced to its entire U.S. cast a vaccinate or terminate Covid-19 vaccination policy.   According to the policy, all subject cast members would have to

---

[1]  These protocols remained in place, even after Covid-19 vaccination was publicly available in late 2020, and even after Disney's vaccinate or terminate mandate was issued in July 2021, and even simultaneously to Disney's current Augmented Protocols for cast unvaccinated for Covid-19.   At no time did Disney require guests to disclose or verify their Covid-19 vaccination status.

"verify" full vaccination status by a company deadline of September 30, 2021.   **Exhibit B**

18. Upon information and belief, Defendant DPEP is an entity that has significant design and implementation authority as well as enforcement oversight regarding Disney's vaccine mandate in Florida, including but not limited to "restrictions" and "accommodations" requested against the Covid-19 shots, despite the mandate announcement coming from Mr. Paul Richardson, Sr. Executive Vice President and Chief HR Officer at Defendant The Walt Disney Company.

19. The Covid-19 vaccination was "a condition of [] continued employment by The Walt Disney Company" and specified that "fully vaccinated" meant two weeks from the final dose of any two-dose Covid-19 vaccination or the sole dose of the single-dose option. The Notice also specified that, until impact bargaining completed with union member employees, the mandate only applied as to non-union employees.   Employees subject to collective bargaining agreements would be subject to terms as specified in their respective MOUs reached on the mandate.

20. Apparently, the dire nature of the urgency of obtaining the Covid-19 vaccination was subject to effective negotiation.   Disney informed all cast in September 2021 that various unions involved in representation of cast members had reached agreements regarding extended deadlines, including but not limited to: STCU (Service Trades Council Union) and AEA (Actors Equity Association) extended the deadline from September 30 to October 22; AFM (American Federation of Musicians) Local 389 to October 31; CMC (Craft Maintenance Council) and BVCC (Buena Vista Construction Company) secured November 1 extended deadline; and SPFPA (Security, Police & Fire Professionals of America) Local 603 secured a November 7 deadline.   Other unions were still in

negotiations.

21. From the initial announcement until November 18, 2021, cast members were bombarded with many email notices, as well as managerial texts and warnings, to "verify" their Covid-19 vaccination status as fully vaccinated in the online Cast Member Hub.

22. On November 19, Governor DeSantis signed into law Fl. Stat. §381.00317 and §112.0441, rendering unlawful any further "vaccinate or terminate" Covid-19 mandates by Florida employers.

***Disney's Discriminatory Augmented Health & Safety Protocols***

23. That same day, Disney sent an apparently targeted email **Exhibit C,** to cast members who reside or work in Florida and had "not yet verified [] COVID-19 vaccination status with the company" nor "been granted an accommodation." The email stated that Disney would "pause the enforcement" of the mandatory vaccine policy for "Florida-based Cast Members and employees" due both to the new Florida law passed and OSHA's Emergency Temporary Standard (issued November 5, 2021) being stayed by the U.S. Court of Appeals for the Fifth Circuit on November 12, 2021.   The email also pointed out that Disney determined 90% of its Florida staff had complied and were fully vaccinated at that time.

24. Disney still required Covid-19 unvaccinated employees to verify their unvaccinated status through TrustAssure process, and stated plainly that those who did not verify status would be considered unvaccinated.   The notice also provided a link to "safety protocols" cast members who were not verified as "fully vaccinated" would be required to follow, "including face coverings and physical distancing," with no additional details thereto.

25. The TrustAssure "verification" program implicates Fl. Stat. § 381.00316's prohibition on

business or governmental entities requiring "any documentation certifying COVID-19 vaccination or post-infection recovery to gain access to, entry upon, or service" from the business or governmental entity.

26. Moreover, in the terms of the enforcement of the "Augmented Protocols," the policy is a *de facto* Covid-19 vaccine mandate, in violation of Fl. Stat. § 381.00317 and § 112.0441. From a FAQ for leadership, it is clear the Augmented Protocols are not an exemption under the Florida law, are not voluntarily applied for, and refusal to comply despite other bases for exemption will result in discipline and termination:

> **Why are some Cast required to wear a N95 mask instead of a Disney-supplied face covering?**
> These safety protocols are in place for those who have not verified their vaccination status through TrustAssure. A N95 mask is required for higher contact roles with indoor extended interaction with another individual.
>
> **What happens if I don't follow the Augmented Safety Protocols?**
> Non-compliance with the Augmented Safety Protocols may result in disciplinary action, up to and including termination.
>
> **Do these Augmented Safety Protocols apply to Cast who verified their vaccination status through TrustAssure?**
> No.

27. Over time, and specifically in 2021 through 2022, after vaccination became available to the public, Disney modified its general Covid-19 safety protocols, depending on location and vaccination status – dropping masking outdoors, then dropping social distancing. On November 8, 2021, vaccinated cast would no longer be required to wear facial covering outside except "on-stage", meaning around guests.

28. By mid-February, 2022, vaccinated cast were no longer required to wear any facial coverings in any location except on Disney transport. Ultimately by mid-April, even the restriction to wear facial coverings on Disney transport lifted for vaccinated cast.

29. On February 24, 2022, the Florida Department of Health issued new guidelines no longer

advising businesses to require facial coverings for any employees, on the grounds there is no proven significant clinical benefit against (Covid-19) infection for facial coverings among the general population.

30. Notwithstanding this state-issued health guideline, Disney continued its own policies until May 10, 2022, when it announced that vaccinated cast could follow local government mask policies. Unvaccinated employees like Plaintiffs were still required to abide by the Augmented Protocols, despite state health guidance.

31. Cast members like Plaintiffs quickly learned that Disney's policy in lieu of a now-unlawful "vaccinate or terminate" scheme was not *status quo* under general Covid-19 safety protocols, but a new discriminatory scheme that singled out visually and physically Plaintiffs who were unvaccinated for Covid-19. Disney also declared their new "Augmented Health & Safety Protocols" (hereinafter "Augmented Protocols") as "accommodations" for some approved exemptions as of the fall of 2021.

32. The Augmented Protocols now suddenly enforced on Plaintiffs consisted of harsh isolation and restrictions, causing serious breathing problems for Plaintiffs and making it nearly impossible to find a compliant manner and location in which to eat or drink while on shift. The Augmented Protocols effectively added to and made permanent on a daily basis, indefinitely, the Disney Covid policy for Covid-19 positive cast, cast who were symptomatically sick, and cast who were known to have been exposed to Covid-19. **Exhibit A.**

## COVID-19 Augmented Health & Safety Protocols

Employees and Cast Members who are required to follow the COVID-19 Augmented Health and Safety Protocols must adhere to the following:

- Whether indoors or outdoors, a Disney-supplied face covering must be worn at all times. In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.
- You may only remove your face covering if:
  - You are alone in an office with the door shut.
  - You are performing tasks in the approved Green Zone.
  - You are actively performing onstage in a COVID-blocked entertainment offering and maintaining six (6) feet of distance from others.
  - You are six (6) feet of distancing from others and actively eating or drinking.
- If eating or drinking in the workplace, you must remain no less than six (6) feet from others in order to remove your face covering.
- Instead of a Disney-supplied face covering, employees and Cast Members in select high-contact roles may be required to wear a Disney-supplied N-95 mask instead and at all times, both indoors and outdoors. **In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.**

*Please note: Your leader and/or Human Resources (HR) will inform you if you are required to follow the Augmented Health & Safety Protocols. This guidance applies only to those employees and Cast Members who have been notified by their leadership and/or who have received an approved accommodations through the Employee Relations process.*

33. None of the written versions of the Augmented Protocols that Plaintiffs have seen specifies any definition of cast members subject to the Augmented Protocols. None show a date of enforcement nor a date by which these harsh restrictions will be lifted, nor if any conditions precedent may trigger the termination of these Protocols.

34. The Augmented Protocols changed from time to time, and by May 2, 2022, the extreme facial coverings were enforceable indoors as to "select roles" which "may be designated as high contact"; but guests and unvaccinated staff could elect not to use any facial covering. Additionally, all unvaccinated life guards, both indoors and outdoors "must use a ViroMax viral and bacterial filter while actively performing CPR."

35. The federal Occupational Health and Safety Administration ("OHSA") provides guidance and regulation, as well as compliance enforcement regarding workplace safety. Disney's

requirement that certain (Covid-19 unvaccinated) employees wear N-95 PPE, indicates Disney's reliance on particular OSHA standards for handling hazardous substances in the workplace.    Disney's accommodations, named "permanent restrictions", for those unvaccinated for religious reasons required cast members to enter the "OSHA respiratory program" at Disney.

36.    Whether an (Covid-19) unvaccinated cast member is required to enter the respiratory program or not is ostensibly based on whether the cast member him or herself was in a "high contact role," not whether there were environmental hazards or toxins from which to protect cast members in the workplace.    **Exhibit D**

37.    However, the OSHA rules regarding hazardous substance precautions are not those applicable to OSHA guidance regarding Covid-19 precautions. For example, workplaces deemed to have possible toxic materials and contaminated air include shipyards, marine terminals, and construction.[2]    Disney "restrictions" requiring adherence to a respiratory program were required in public-facing hospitality and service roles in theme parks, resorts and other non-industrial, non-medical services workplaces.

38.    Indeed, Disney's requirement that Covid-19 unvaccinated, "unverified" cast with religious exemption requests like Plaintiffs wear respirators under the Augmented Protocols contravenes OSHA standards for workplace safety in the presence of hazardous substances. Proper training must be given when wearing respirators like N95 masks, and OSHA, as well as respirator manufacturers, recognize the likelihood of "hazards associated with the use of

---

[2] See, eg: https://www.osha.gov/coronavirus/safework#ftn1, last accessed December 21, 2022, *cf* Standard No. 1910.134, *Personal Protective Equipment; Respiratory protection,* at https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134, last accessed December 21, 2022.

the respirator," such that extended use of the facial covering without respite is against proper guidance.[3]

39. Manufacturer guidance regarding respirators like N95 masks also clearly warn that the respirators may be used in the event of "exposures to certain airborne biological particles (e.g. viruses, mold, *Bacillus anthracis, Mycobacterium tuberculosis,* etc.) but cannot eliminate the risk of contracting infection, illness, or disease." The instructions further specify "limitations" of use of PPE, including that the "respirator is designed for occupational/professional use by adults who are properly trained in their use and limitations. Individuals with a compromised respiratory system…should consult a physician and complete a medical evaluation prior to use." Respirators also have a "shelf life" or expiration date in their packaging and must be stored in proper temperature and humidity conditions. **Exhibit E.**

40. By early August, the Centers for Disease Control ("CDC") issued its advisory that there was no health or safety basis upon which to engage in different policies or treatment toward the Covid-19 vaccinated and unvaccinated.

41. On August 16, 2022, Disney finally dropped enforcement of its harsh and discriminatory Augmented Protocols. **Exhibit F** This announcement came within days of OSHA's Guidance Update reflecting CDC changed guidance against disparate treatment of Covid-19 vaccinated and unvaccinated. However, the announcement made no admission of the unlawful nature of the humiliating and discriminatory Augmented Protocols. Rather, the notice indicated Disney was free to engage in open discrimination in the future in the same

---

[3] *Id.* and see **Exhibit E,** 3M Manufacturer specifications, user instructions, and warning regarding Aura™ Particulate Respirator N95.

fashion: "These protocols are subject to change at any time.   Employees represented by a union/Return-to-Work Agreement, please consult your leader to understand what protocols apply to you."

***Reedy Creek Improvement District***

42.  Defendant The Walt Disney Company acquired the land that became Reedy Creek Improvement District in the 1960s.   By 1966, the landowners – all Disney subsidiary business entities – petitioned the Circuit Court of the Ninth Judicial Circuit   for creation of the "Reedy Creek Drainage District under Fl. Stat. § 298, *et seq.*, which was then incorporated as a public corporation on May 13, 1966.

43.  In accordance with Mr. Walt Disney's vision for the property, Disney then petitioned the Florida State Legislature for the creation of the "Reedy Creek Improvement District," which was a virtually autonomous local Florida government as a *special district*, created by the Reedy Creek Improvement Act, signed into law on May 12, 1967.[4]

44.  RCID is an entire district, or local government, that carries out all the basic functions of a local government.   Prior to the creation of RCID, these services for this region were originally and solely performed by the governments of Orange and Osceola Counties. These services include:

- Law enforcement - Disney contracts with Orange and Osceola County local law enforcement agencies
- Fire Department
- Environmental Protection - through the donation of land to the state for conservation easements
- Creation and Enforcement of its own building codes

---

[4]  Chapter 67-764 created the Reedy Creek Improvement District, see https://www.rcid.org/wp-content/uploads/2015/10/RCID-Charter.pdf last accessed on December 21, 2022; Chapter 67-1104 established the City of Bay Lake; and Chapter 67-1965 established the City of Reedy Creek (later renamed as the City of Lake Buena Vista around 1970.)

- Utilities - wastewater treatment and collection, water reclamation, electric generation and distribution, solid waste disposal, potable water, natural gas distribution, and hot and chilled water distribution are managed through Reedy Creek Energy Services, which has been merged with the Walt Disney World Company
- Roads - Many of the main roads in the District are public roads maintained by the District, while minor roads and roads dead-ending at attractions are private roads maintained by Disney; in addition, state-maintained Interstate 4 and U.S. Highway 192 pass through the District, as does part of the right-of-way of County Road 535 (formerly State Road 535).
- Transportation - Disney provides transportation for guests and employees in the form of buses, ferries, and monorails, under the name Disney Transport. In addition, several Lynx public bus routes enter the District, with half-hour service between the Transportation and Ticket Center (and backstage areas at the Magic Kingdom) and Downtown Orlando and Kissimmee, and once-a-day service to more points, intended mainly for cleaning staff. Half-hourly service is provided, via Lynx, to Orlando International Airport

45. Disney exercises complete control of RCID and enjoys a self-beneficial arrangement whereby it pays local taxes to the RCID, which in turn, reinvests that tax revenue into Disney enterprises and businesses.   The United States District Court for Middle District of Florida has found that "[t]he evidence does not support the contention that Disney and Reedy Creek are completely separate entities that do not exert control over each other, rather than "common employers," "joint employers," or parts of an agent/principal relationship." *See Lang et. al v. Reedy Creek Improvement District*, 888 F. Supp. 1143 (M.D. Fla. 1995). Thus, under Florida Law, Defendant The Walt Disney Company, and collectively, Disney subsidiaries operating within Florida, constitute a local government entity, subject to Florida constitutional and statutory requirements of public employers.

46. The municipalities Bay Lake and Lake Buena Vista which are located within RCID function as company towns within the Disney company *district* under Florida law.   RCID property is open for use by the general public, serving an average of 250,000 people in the Walt Disney World parks and resorts on a daily basis with over 75,000 employees in Florida alone.

## FACTS RELEVANT TO PLAINTIFF BARBARA ANDREAS' CLAIMS

47. Plaintiff Barbara Andreas was hired by Disney in June 2001, and for seventeen years of her career, she has been in leadership positions.   At the time she was terminated by Disney, she was a Guest Experience Manager working out of the ESPN Wide World of Sports location in Osceola County.   Her duties included overseeing guest operations throughout the complex, from parking lot to main entrance, box office, and all buildings and fields used in events.   She oversaw hundreds of cast members daily and interacted with thousands of guests attending events.   Ms. Andreas engaged in in-person meetings for her position, including planning strategy meetings for upcoming events.

48. For the last two decades Ms. Andreas has worked for Disney, she has been an exemplary cast member.   She had no record in her entire employment of disciplinary action, reprimand, or "points" for violation of policy or code of conduct.   She received recognition informally from guests who applauded her service, as well as official special recognition from Disney's leaders, in merit-based bonuses and salary increases, and selection for special projects including the opening team for Shanghai Disneyland.   Her annual evaluations consistently yielded positive feedback. She was tasked by Disney to mentor younger cast members and was hand-selected to join that team based on her leadership skills.

49. Although Disney cast members were returned to work by company policy in July of 2020, Ms. Andreas was on furlough until June 2021, at which time, facial covering requirements for all cast members were relaxed.

50. Upon the announcement of Disney's vaccinate or terminate mandate and Disney's reversal on Covid-19 safety protocols for all cast, on August 20, 2021, Ms. Andreas filed her religious exemption request by email to Disney HR, copying her leader Kelly Day.   **Exhibit G.**

51. Ms. Andreas asserted that both Disney's vaccination requirement and the facial covering requirements were contrary to her religious beliefs and she provided Disney's requested exemption form, a Religious Affirmation signed and notarized, and a supporting letter from her pastor, Rev. Dr. John A. Vacchiano, Jr. of The Church at the Cross.

52. She asserted: "Religious creed includes my dress and my grooming practices, including what I put on my head or face. Wearing a face covering is an affront of my Christian beliefs. Further, participating in a medical experiment, such as covid testing or vaccines, is also a violation of my religious beliefs." **Exhibit H** Her attached Affirmation also provides scriptural basis that the vaccination mandate and facial covering requirements are against her religious beliefs, including: use of aborted fetal cells in the manufacture or testing of the Covid-19 vaccines Proverbs 6:16-18, Psalm 22:10; the Covid-19 vaccines are an unlawful contamination of her blood Leviticus 17:11; she is obligated to care for her body as the "temple of the Holy Spirit" 1 Corinthians 6:19-20, Jeremiah 30:17; and covering the face covers the image of God in her Genesis 2:7, 1 Corinthians 11:7, Genesis 1:26-27 (including other references). **Exhibit G**

53. On August 30, 2021, HR Manager, Porcia Wade, called Ms. Andreas to discuss her religious views and accommodation request. During this approximately thirty-minute phone call, the "discussion" became more of a cross examination.

54. On September 17, 2021, Ms. Andreas participated in a Zoom meeting at the request of her general manager, Mark Dukes. During the meeting, Mr. Dukes called attention to the fact that Ms. Andreas had not submitted an attestation of vaccination status through TrustAssure. Ms. Andreas responded that she was awaiting a response from HR to her accommodation request. After the call, Ms. Andreas contacted her immediate supervisor, Ms. Day, who

confirmed that she herself had already informed Mr. Dukes of Ms. Andreas' pending request.

55.  On September 29, 2021, Ms. Andreas received an email that her request was still under review. On October 13, 2021, Ms. Andreas again met with Ms. Day to discuss her growing feelings of anxiety, peer pressure, discrimination, and the shame of being coerced and threatened to compromise her religious convictions out of fear of losing her job. Ms. Andreas told Ms. Day that she intended to send a letter to HR requesting expedited processing of her request, pursuant to Disney's "Speak Up" policy, and Ms. Day requested to share the letter with VP Faron Kelley and SVP Rosalyn Durant. **Exhibit I.**

56.  Disney took no remedial action after Ms. Andreas' repeated notices. On October 29, 2021, Ms. Andreas received the same email from HR stating that her request was still in review.

57.  On December 18, 2021, Ms. Andreas again discussed her concerns with Ms. Day, and on December 22, 2021, Ms. Wade called Ms. Andreas to further discuss her request for accommodation. During the approximately forty-minute conversation, Ms. Wade asked extremely intrusive and inappropriate questions of Ms. Andreas, about her lifestyle, grooming habits, and the beliefs of her pastor and others of the same faith. Ms. Andreas objected to Ms. Wade's line of questioning and expressed her objection to Disney's long delay in responding to her religious accommodation request. Ms. Wade stated that Ms. Andreas' situation was unique since it was "more of a safety thing."

58.  About a week later, Disney categorically denied Ms. Andreas' accommodation request. On December 29, 2021, Ms. Andreas received an email from the DPEP Restrictions and Accommodations Team denying her request for religious exemption:

> After careful review of the information you provided, we are unable to conclude that you are prevented from wearing a face cover due to a sincerely held religious belief, practice or observance.   In addition, based on the essential job functions of your role, we are not able to allow an exemption from the face cover requirements, which have

been implemented as a health and safety protocol to promote a safe environment for cast members and guests.  As a result, we must deny your request, and if you are unable to follow this health and safety protocol, your employment will be subject to separation. **Exhibit J**

59. Immediately thereafter, Ms. Andreas sent a follow-up email to Ms. Wade inquiring as to how she arrived at the conclusion that her deeply held beliefs are unworthy of any accommodation.

60. On February 14, 2022, having received no response from Disney, Ms. Andreas retained counsel, who sent a letter to Ms. Wade on Ms. Andreas's behalf, with copy to Ms. Day and Mr. Kelley, concerning Disney's flagrant violations of Florida and Federal law in the mishandling of Ms. Andreas's request for accommodation on religious grounds, and the disparate treatment of employees who refused vaccination in compliance with their religious beliefs. Counsel warned Disney that any resultant punitive or retaliatory actions taken against Ms. Andreas for her refusal to comply based on her religious belief would be in violation of state and federal law.   **Exhibit K.**

61. On February 18, 2022, seven hours into her work shift without wearing a mask, Ms. Andreas was approached by Ms. Day who instructed her to put a mask on or to go home. Ms. Andreas stood firm to her convictions and was sent home.

62. On March 1, 2022, Disney's in-house lawyer, Ms. Jennifer Suzuki, responded to Ms. Andreas' counsel's notice with a categorical denial of any wrongdoing and asserted Disney would enforce its harsh Augmented Protocols against Ms. Andreas.  On March 2, 2022, counsel responded to Ms. Suzuki reiterating Ms. Andreas' position and advising that she intended to resume her position for her next scheduled shift without complying with Disney's oppressive Augmented Protocols.

63. The next day, March 3, 2022, Ms. Andreas received multiple calls from Ms. Wade while

attending Bible study with her young children on a scheduled day off.    She called back and

Ms. Wade asked her if she sought to add anything concerning her religious beliefs.    Ms.

Andreas reminded Ms. Wade that she is not obligated to persuade Disney to agree with her

religious belief under EEO laws.

64.    On March 4, 2022, Ms. Andreas reported at 9am for her shift. Upon entering the office, a

coworker said he was "surprised" to see her because Ms. Day announced to the leadership

team that Ms. Andreas would not be at work that day. Ms. Andreas was told she would have

to go home if she would not wear a mask. Ms. Andreas then received email correspondence

calling her protected actions insubordinate and non-compliant.

65.    An hour later, Ms. Andreas was approached by proprietor Jamie Entwhistle and a security

host in plain clothes. After following the two gentlemen into an obscure box office, where

she was given notice that Disney had terminated her employment. Mr. Entwhistle refused

Ms. Andreas's request to involve her counsel in the conversation.    Ms. Andreas was escorted

down to her shared office where she was told to collect her things while security and Mr.

Entwhistle stood watching her.    They escorted her from the building to her car and collected

her company ID, parking pass and work phone.

66.    Since her termination, Ms. Andreas has filed claims of discrimination and retaliation with

the Florida Commission on Human Relations and concurrently with the federal Equal

Employment Opportunity Commission, as well as filing a complaint with the Florida Private

Employer Vaccine Mandate Program ("PEVMP") for violation of Florida's prohibition on

Covid-19 vaccinate or terminate mandates.    She received her Right to Sue Notice from the

EEOC on September 26, 2022.

## **FACTS RELEVANT TO PLAINTIFF STEPHEN CRIBB'S CLAIMS**

67.  Mr. Cribb has been employed at Disney for eleven years, and most currently performed duties as a Guest Experience Manager.   In less than two years at Disney, Mr. Cribb was promoted to management and was the winner of the Walt Disney Legacy Awards, the highest honor awarded to cast.   He was also especially selected for media events and Disney Cruise Line Experiences to the Polynesian Resort.   The Disney Cruise Line even recruited him to work for a year contract on the Disney Fantasy.

68.  When Disney returned cast members to work in the summer of 2020, Mr. Cribb returned and complied with the uniformly-applied and enforced Covid-19 safety protocols at that time.

69.  However, within a year, Disney imposed the vaccinate or terminate Covid-19 mandate, and Mr. Cribb promptly submitted his religious exemption request on August 20, 2021.   **Exhibit L**

70.  In his exemption request, he provided the basis for his religious objection to Disney's mandate: "As a devout and practicing Christian, I have strong religious convictions against abortion…the Jansen vaccine as well [as] the Moderna and Pfizer vaccine have all used cells from a terminated fetus, either in testing or developmental stages of the vaccine."   Mr. Cribb also stated he researched skincare and other products carefully to avoid violating his conviction regarding abortion.   He also stated that his beliefs required him to be "extremely cautious about putting anything into my body – I have never consumed tobacco or illicit drugs, and I have abstained from sexual intercourse for my entire life (awaiting marriage)." He provided Bible references to support his position, including Psalm 139:13 and 1 Corinthians 6:19-20.   **Exhibit L**

71.  On October 29, 2021, Mr. Cribb received an auto-generated email from Disney's HR

department stating that his accommodation request was being processed.   Aside from this
auto-email, Mr. Cribb received no follow-up or substantive response from Disney
concerning his statement.

72.    Between August 2021 and March 2022, Mr. Cribb also engaged his direct supervisor, Mr.
Reggie Blanco, as well as general manager, Mr. Jeff Korte, on multiple occasions, similarly
expressing objection to the Covid-19 vaccine mandate. In or about the first week of
September 2021, Mr. Korte summoned Mr. Cribb to his office for a follow-up meeting which
was only an effort to persuade Mr. Cribb to abandon his convictions and reconsider his
position on the vaccine, in light of the FDA's approval of the Pfizer-BioNTech vaccine,
"Comirnaty." Mr. Cribb explained the FDA approval did not change the nature of his
religious concerns. Nevertheless, Mr. Korte continued pressing Mr. Cribb to debate the
merits and sincerity of his religious beliefs.

73.    September 15, 2021, Mr. Cribb attended a virtual Q and A session with the VP of Disney
Resorts, Allison Armor, at which leaders were given the opportunity to submit questions and
concerns regarding the vaccine/mandate. During the session, Mr. Cribb expressed concern
that Disney's increasingly aggressive messaging surrounding "vaccination" was creating a
hostile work environment in which he, and like-minded colleagues, felt bullied because of
their religious beliefs and practices. He pointed out that Disney had failed to provide any
guidance as to the process for an employee to request exemption or accommodation. Indeed,
most employees with whom Mr. Cribb communicated had no idea that exemption was even
an option.

74.    No one at Disney informed Mr. Cribb that he was subject to Disney's Augmented Protocols
as a Covid-19 unvaccinated cast member, and these were, at best, erratically enforced by

managers and leadership.   Then, February 10, 2022, Mr. Blanco suddenly texted Mr. Cribb that he was required to be wearing an N95 mask on shift.   Mr. Cribb responded that he would not be comfortable with that protocol and had no documentation from HR regarding any accommodations.   Mr. Blanco suggested that, due to Florida law change in November 2021, Mr. Cribb should hear from HR as the mandate was "on hold".   Mr. Blanco asked Mr. Cribb to come to his office to discuss and pick up a spare N-95.   At no time did Mr. Cribb receive the required N95 mask fitting or training in proper use.

75.   The severity of the Augmented Protocols and their enforcement compared to normal treatment of all other cast and guests was highlighted by a leadership Zoom conference Mr. Cribb attended in preparation for a Mardi Gras event at Disney's Port Orleans Resort.   The resort's General Manager, John Berko, addressed potential health and safety concerns among the staff in light of Disney's recently announced policy change. Mr. Berko stated that he had abandoned plans to implement additional "safety protocols" for the event because Disney's safety team had assured him that they had no COVID-19 related concerns about the outdoor event and that "safety protocols" were no longer necessary. Regardless, Mr. Berko went on to announce that unvaccinated employees would still be required to wear masks and relegated to separate tables and segregated from everyone else.   Mr. Cribb was overwhelmed by the humiliation of Disney's overt discrimination.

76.   From March 6, 2022 forward, Mr. Cribb declined to comply with the Augmented Protocols. Then, a week later, Mr. Blanco again confronted Mr. Cribb by text message, reminding him that he was subject to the Augmented Protocols.   Mr. Cribb replied by text that because no Covid-19 vaccinated cast members were required to be singled out in this way, he would not comply with such discriminatory policies. He asserted that both Florida and federal law

protect Mr. Cribb's expression of his rights in his employment, and asserted that the Augmented Protocols amounted to an unlawful *de facto* Covid-19 vaccination mandate.

77. Finally, on March 16, Mr. Cribb was given an ultimatum that he comply with the unlawful Augmented Protocols or go home. Mr. Cribb asserted that he would not voluntarily abandon his shift; however, if Disney was prepared to take official action against him for his religious beliefs and practices, then he would peacefully comply. He was suspended that afternoon and his company ID badge and office keys were confiscated.

78. Two days later, Disney's HR through Portia Wade followed up with inquiry regarding Mr. Cribb's suspension. Mr. Cribb requested that he not continue discussing the matter without his retained counsel present. Disney did not respond and would not allow Mr. Cribb's counsel to be present in discussions.

79. On March 23, 2022, then, counsel requested that Disney direct correspondence directly to him, and Disney flatly refused. Counsel warned Disney in writing yet again that its conduct was unlawful toward Mr. Cribb and for nearly eight months since Mr. Cribb had requested Disney address his religious exemption and concerns regarding Disney's policies, Disney had failed to communicate with Mr. Cribb.

80. With impunity, Disney ignored counsel's demand to channel communications through him and repeatedly contacted Mr. Cribb on his personal cell phone. Then, Ms. Wade sent an email to Mr. Cribb and did not copy counsel. Counsel on March 30, 2022, responded to Ms. Wade and Disney's Deputy General Counsel Jennifer Suzuki, "I have made it abundantly clear to you and to Ms. Suzuki that I am representing Mr. Cribb concerning Disney's discriminatory policies and the adverse employment action that it took against Mr. Cribb for asserting his lawfully protected religious beliefs/acts. I have initiated claims with

the EEOC, the Florida Commission on Human Relations, and the Florida Attorney General

on Mr. Cribb's behalf; therefore, he will not be speaking directly with you or anyone from

Disney unless I am present." **Exhibit M.**

81. Disney terminated Mr. Cribb's employment April 25, 2022.

82. Mr. Cribb's claims were processed by the Florida Commission on Human Relations

("FCHR") and concurrently submitted to the EEOC, and the investigation was concluded

beyond the 180 days after he filed his charge of discrimination.

## FACTS RELEVANT TO PLAINTIFF ADAM PAJER'S CLAIMS

83. Plaintiff Adam Pajer was been a cast member at Disney for seven years since May 2015,

most recently as a Banquet Server or as-needed Banquet Captain with the Orlando Disney

resorts and theme parks.   In his position, Mr. Pajer served and cleared tables for guests, set

tables with linens, polished glass and silverware, set buffets, bars, and bartended, as needed.

He had leadership obligations in preparing for events, including helping to set up supplies

according to a Banquet Event Order, if he was first to the property to begin set up.

84. When Disney returned cast members to work, Mr. Pajer returned to his shifts, but then Disney

began its vaccinate or terminate mandate a year later.   On October 15, 2021, Mr. Pajer filed

his religious exemption request with Disney. This exemption has never been processed to

conclusion.

85. He declared his Christian beliefs that dictated his refusal of the Covid-19 vaccine, despite

Disney's mandate, and provided supporting Bible references: John 8:32, John 14:6, John

11:25, 1 Corinthians 3:16-17, and Ecclesiastes 7:17. He stated that he must care for his body

as "God's temple" and that the "truth is through God the Father and his Son Jesus", such that

he is obligated to pursue the truth about what he puts into his body and avoid self-harm or

the risk of self-harm.   "Our bodies were not made by God to put a known poison into it," he concluded.   **Exhibit N.**

86. Since Fall 2021, after prior threats of termination under the vaccination mandate, Mr. Pajer's managers have treated him as if he were leprous. Mr. Pajer was never given an option by Disney to receive any alternative or accommodation in lieu of the Augmented Protocol requirements, more restrictive than facial covering and Covid-19 safety protocol during the height of the Covid-19 pandemic in 2020.

87. On February 5, 2022, Mr. Pajer sent around a notice in a group chat to other part time cast members pertaining to the discriminatory Augmented Protocols. He asserted:

> Managers are starting to discriminate against people who didn't take the experimental propaganda procedures. They tried on me but could not even show where it says that I had to wear a mask backstage when others do not. I told them it was discriminatory and I will at this time not be complying and asked for them to call HR….Also many managers seem to be doing this unaware [sic]. Please remind them that we have equal protection under the law and we must all be protected equally.

88. In the end of February when all restrictions for all guests and "verified" vaccinated cast members were lifted, one of Mr. Pajer's managers, Lauren M. Lahr, confronted him and demanded he wear a mask at all times inside and outside on Company property. From then on, Mr. Pajer received mixed information regarding masking from his supervisors. During one shift, three catering managers did not enforce any Augmented Protocols against Mr. Pajer while he was on shift.

89. However, on Mr. Pajer's last shift in February 2022, Shelly Dunkley required Mr. Pajer to wear facial covering. He refused and informed her he had submitted his religious exemption to the Company, and he had yet to hear back from them. Mr. Pajer informed Ms. Dunkley she was discriminating against him. Ms. Dunkley had another manager get

involved, Russell P. Bennage, who told Mr. Pajer he must wear a mask at all times, only to take it off when actively eating or drinking. These two managers made clear to Mr. Pajer it did not matter that he submitted a religious exemption request.

90. Mr. Pajer continued to provide written and verbal notice to Disney regarding its ongoing, habitual, and blatant violation of his civil rights. On May 5, 2022, Mr. Pajer reached out to Peyton Keaton by email, detailing the ongoing discrimination against him. He also reiterated Disney HR's failure to respond to him or indicate anything regarding his prior exemption applications. Mr. Pajer clearly indicated to Mr. Keaton that the unequal treatment of cast members, with some being subject to harsh, unreasonable, and punitive Augmented Protocols, while others were able to work mask-free and not visibly singled out for any reason, was a violation of law. Mr. Pajer also informed Disney he had filed a report with the Florida State Attorney General.

91. On May 12, 2022, Mr. Pajer was working a regular shift at the Disney Yacht and Beach Resort. He printed written statements to hand out to managers who had been enforcing the unlawful Augmented Protocols. While he was walking toward his work location and attempting to hand this document to his manager Sharon Edwards-David, she raised her voice and yelled at him to not talk to her. He offered his written statement to her and verbally told her she was violating law with her conduct, then continued working.

**Discrimination in the workplace:**

I Adam Pajer am being discriminated against by
you_____. Alongside with the Walt Disney
Company at WDW Orlando. You are hereby notified that you are
breaking the law: attacking mine and other civil liberties, our God
given rights endowed inside the United States Constitution and
Discriminating against us by means of harassment, intimation, Intimidation (Al)
segregation, and bullying.

This needs to stop immediately and action to resolve your
actions must be accounted for.

92. Ms. Edwards-David then gathered two other managers, Quentin Schofield, and Wes
Mohler and called Mr. Pajer into an office where they repeatedly belittled, harassed, and
verbally attacked him while he attempted to explain how their conduct discriminated
against him and violated law.

93. Mr. Pajer attempted to give one of his papers to them. Instead of accepting it and then
disposing of it, Mr. Schofield grabbed a lighter and attempted to burn it while Mr. Pajer
still held the paper in his hand.

94. In retaliation for Mr. Pajer's efforts to assert his rights and inform Disney management of
its unlawful conduct against him, the managers demanded he leave the premises, cut his
shift, and lose the rest of his shift pay. Mr. Schofield yelled at Mr. Pajer and claimed Mr.
Pajer was bringing Disney's discriminatory actions on himself. He laughed at Mr. Pajer
and all three ridiculed him. Mr. Mohler walked Mr. Pajer to the timeclock and required
him to punch out and leave.

95. On May 14, 2022, Disney suspended Mr. Pajer. This suspension was implemented directly
after and as a result of Mr. Pajer's complaints regarding the illegal discrimination against
him by Disney - and after he filed a complaint with the Florida Attorney General's office

regarding Disney's conduct.

96. Additionally, Mr. Pajer requested that Disney speak only to his attorney after the May 12 incident with the three managers. Disney flatly denied this reasonable request according to Mr. Pajer's union representative. In fact, Disney pressed Mr. Pajer, without the assistance of his counsel, to submit his written statement regarding the event and to speak to Disney representatives without the presence of counsel. Mr. Pajer's counsel also reached out to Disney directly on June 4, 2022, to which Mr. Keaton replied only to Mr. Pajer:

I am writing to acknowledge receipt of Rachel's email. The Company does not include non-employees in our workplace investigations. Employee Relations would still like the opportunity to hear from you about your allegations of discrimination. Additionally, Leadership has follow up questions about your workplace conduct on May 12, 2022. Leadership will be calling you to schedule this meeting.

97. Additionally, from May 14 to June 28, 2022, Disney continued to schedule Mr. Pajer for shifts, despite having taken from him his company ID card to enter Disney property to report for work. Counsel inquired on June 3 of Mr. Campbell at Disney as to Mr. Pajer's status and requirement to report for his next shift scheduled on June 5. Disney never responded to counsel, and only manager Richie Acosta provided acknowledgement to Mr. Pajer that he was under suspension and would not need to report.

98. On June 21, 2022, Mr. Pajer met with two of his banquet managers, Jim Campbell, and Donnie Gill and shop steward Glenn Guider. Mr. Campbell provided a blank piece of paper to Mr. Pajer and advised that he could write down new accusations Disney had made against him. These included:

- The manager said I was in her personal space.
- That I robotically ranted about Disney taking away my rights.
- That the leader was fearful of me.
- That I was overly aggressive [in] trying to give her a piece of paper.

- That I refused to go back to work.
- That somehow, I mentioned about 'calling my people.'

99. Mr. Pajer was shocked by these statements. Mr. Campbell advised Mr. Pajer to write down his side of the story for the company to investigate. He rejected all the absurd and incoherent charges and requested that Disney contact counsel.

100. On June 28, Disney terminated Mr. Pajer's employment without further investigation. Mr. Pajer has filed claims of discrimination and retaliation with the FCHR and concurrently with the EEOC.  He also filed a complaint against Disney to the PEVMP. Mr. Pajer received his Right to Sue Notice on December 23, 2022.

**FACTS RELEVANT TO PLAINTIFF STEVE GIBBONS**

101. Plaintiff Steve Gibbons began working with Disney in summer of 2017, and until his unlawful termination, was working in the "essential" position of Computer Systems Technician under Defendant Walt Disney Parks & Resorts, U.S., Inc.  Plaintiff Gibbons never received a single written corrective action during his entire tenure at Disney, including Sunday December 19, 2021, the day he was told to go home and asked to surrender his badge for not complying with the Safety Protocol.

102. When Disney cast members returned to work, Mr. Gibbons also returned to in-person employment status under Disney's Covid-19 protocols, applicable to all cast.

103. However, when Disney imposed its vaccinate-or-terminate mandate in the summer of 2021, Mr. Gibbons' union negotiated a deadline for compliance of November 1, 2021. Mr. Gibbons filed his religious exemption request on or before October 29, 2021, and received confirmation of receipt and processing from "TWDC Global HR Operations Services." **Exhibit O.**

104. Mr. Gibbons' strongly held belief is that vaccination is an unnatural process, contrary to the God-given immune system of his body, and that God's Word prohibits such unnatural processes against his body.   His notice of request for exemption, supported by his church, and signed by his pastor Carl Stephens, asserted that vaccination is a personal matter which is to be subjected to prayer and Divine guidance.   The exemption also reminded that federal civil rights law granted Mr. Gibbons the right "to receive religious exemption to immunizations" due to "genuine and sincere religious beliefs."   **Exhibit O**

105. When Fl. Stat. §381.00317 and §112.0441 went into effect on November 19, 2021, Mr. Gibbons also filed his exemption with Disney under the new Florida law, citing Covid-19 immunity from prior infection.   **Exhibit O**

106. When Disney could no longer assert direct pressure on Mr. Gibbons for Covid-19 vaccination due to Florida law, Disney continued its coercion through enforcing the discriminatory and harsh Augmented Protocols against Mr. Gibbons.   On December 14, 2021, Mr. Kevin Cuillo asked Mr. Gibbons to come to his office and immediately demanded Mr. Gibbon's vaccinated status.   Mr. Gibbons responded it was not lawfully proper to ask the question, and he would not respond.   Mr. Cuillo responded that Mr. Gibbons' "status" in the TrustAssure program was "unverified" and thus he would be considered unvaccinated and required to submit to daily PPE use.   Mr. Cuillo threatened Mr. Gibbons with discipline, up to and including termination for failure to wear the required facial covering (Augmented Protocols).

107. Mr. Gibbons expressly rejected this threat, and Mr. Cuillo contacted Mr. Gibbons' union who sent a representative immediately.   The union representative did not defend Mr. Gibbons against the discriminatory Augmented Protocols, but instead advised him to

comply with wearing PPE.

108. Mr. Gibbons is OSHA-certified in Hazard Recognition Training in the Construction
Industry.   He knew that the Augmented Protocols imposed by Disney under coercion of
discipline or termination were contrary to OSHA regulations, guidelines and processes;
Disney was forcing cast members to wear N95 respirators without ensuring proper
training in their use and without enforcing safety precautions against long-term use of
respirators.

109. Moreover, the context in which Disney was demanding an OSHA Respiratory Program
including use of respirator N95 facial coverings had nothing to do with hazardous
environments, toxic substances, or industrial labor and construction settings.   Mr.
Gibbons works in IT with Disney, and yet was subjected to protocols OSHA reserves for
industrial labor settings.

110. That day, December 14, 2021, Mr. Gibbons complied with wearing the N95 respirator,
but in very short time, he had trouble breathing and struggled to perform his job due to
respiratory distress from the PPE.   As a result of Mr. Gibbons' distress, another manager
reached out to his union to question the need for Mr. Gibbons to be subject to the
Augmented Protocols.

111. However, the next day, December 15, 2021, the same manager abruptly changed course,
refused to listen to Mr. Gibbons' concerns regarding the Augmented Protocols, and
demanded that Mr. Gibbons comply with PPE wearing, despite knowing first-hand that it
harmed Mr. Gibbons.   Mr. Gibbons was threatened with suspension, and then
termination.

112. Mr. Gibbons contacted another Disney manager, Bonnie Hall, and asserted that the Florida

law required that any policy regarding Covid-19 vaccination had to be in writing, and
Disney was violating the law because the Augmented Protocols to which he was subjected,
were not provided to him in writing at any time.   Mr. Gibbons also reiterated that he had
two exemption requests submitted and pending.

113. The following day on December 16, 2021, Mr. Gibbons was again informed by yet another
manager that notwithstanding obvious performance detriment from being forced to wear
PPE, Mr. Gibbons would be fired if he did not comply and wear the respirator.   Mr.
Gibbons wore the N95 that day, but only as to manufacturer specifications, rather than
continuously, as required by Disney.

114. On December 17, 2021, Mr. Gibbons again contacted Disney's Human Resources team,
who assured him that he was in compliance with his exemptions pending – contrary to the
threatening messages of his managers in his office that he was soon to be terminated.

115. Additionally, on December 17, 2021, Mr. Gibbons reported Disney's non-compliance
with law to OSHA through the Department of Labor's online reporting system.   He
described Disney's violations of OSHA regulation and guidance with regard to forced use
of PPE out of context and without proper training or safeguards against respiratory injury.

116. On December 19, 2022, Mr. Gibbons was commanded to leave work and turn in his
Disney badge for failure to comply with the Augmented Protocols.   He was cited for
"insubordination" and "defacing" or altering a "required costume."   He contacted Disney
HR who provided very conflicting instructions regarding whether he should return to work
the following day.

117. Despite inquiry, Mr. Gibbons never received any follow up or determination from Disney
regarding either exemption he filed.   Instead, on December 23, 2021, just before

Christmas and on a day Mr. Gibbons called out of work sick, due to exposure to Covid-19 (in accordance with Disney's Covid-19 policies), Disney unlawfully terminated his employment while he was on sick leave for the day. Disney provided no documentation prior to this termination, and did not acknowledge that his exemptions were pending.

118. Mr. Gibbons began a grievance process through his union; and upon termination, Mr. Gibbons also filed his claims against Disney's unlawful conduct through the Private Employer Vaccine Mandate Program ("PEVMP") and his claims regarding discrimination and retaliation with the EEOC, concurrently filing with FCHR.

119. Mr. Gibbons received his Notice of Right to Sue from the EEOC on October 3, 2022.

## FACTS RELEVANT TO PLAINTIFF CHERON HAYES' CLAIMS

120. Plaintiff Cheron Hayes was first hired by Disney in mid-2007 as a Financial Analyst supporting Parks Forecasting and Consolidation and very quickly in 2008 promoted to the position of Senior Financial Analyst with the Walt Disney World Resorts team, supporting the Coronado Springs Convention Resort. She later supported the Merchandise Line of Business team and finally was moved to support Defendant Disney Gift Card Services, Inc., where she remained until her unlawful termination.

121. In her position, Ms. Hayes was responsible for maintaining the financial health of the Gift Card business, including overall account reconciliations, project management, maintenance of system financial master data, and financial controls. She had significant responsibility in managing Disney's $180,000,000 gift card liability account balances.

122. Prior to 2021 and her unlawful termination based on lack of Covid-19 vaccination, Ms. Hayes had no discipline or negative employment history with Disney for over fourteen years.

123. When the Covid-19 state of emergency hit Florida, Ms. Hayes was transitioned to fully remote work. Even after Disney returned to in-person employment status for cast, Ms. Hayes remained in remote employment status.

124. In July 2021, when Disney announced its vaccinate-or-terminate mandate, Disney required Ms. Hayes to comply with the mandate by October, despite her 100% virtual position of employment and many years of faithful and excellent job performance. Ms. Hayes had already heard from other cast members that religious exemptions were not being approved by Disney, so this had a chilling effect on Ms. Hayes' filing a religious exemption.

125. She then filed a request for medical exemption on August 10, 2021, based on her prior severe adverse reactions to influenza and shingles vaccines. Her doctor asserted that if she were to get Covid-19 shots, she should have them administered in a hospital in light of her history of severe adverse vaccine effects and allergies to common vaccine ingredients. **Exhibit P**

126. In response to her request, Disney denied her request for continued remote work, regular testing and/or wearing face covering and ignored the fact that she was already purely a remote worker and would not be in any contact with other cast members or guests.

127. Mere days before Fl. Stat. §381.00317 and §112.0441 went into effect on November 19, 2021, Disney terminated Ms. Hayes' employment on November 8, 2021.

128. Ms. Hayes learned shortly thereafter that she was placed on Disney's "Rehire Status" list in light of the Florida law, and she contacted her management regularly to inquire regarding her status of rehire for approximately two months. No one returned her calls or provided her details regarding possible return to work. Upon information and belief, Disney did bring back to work at least five cast members from Ms. Hayes' department after the Florida law prohibiting vaccinate-or-terminate mandates.

129. Ms. Hayes then applied for a new position in January 2022, and Disney offered her a position as Senior Financial Accounting Analyst – a position based in Florida which would have both remote and in-person office employment.   Disney also reinstated her credentials in light of the pending offer of new employment.

130. Again, despite federal and state law, Disney required Ms. Hayes to be Covid-19 vaccinated in order to obtain the job Disney offered her.   She submitted both a religious and medical exemption, pursuant to Florida and federal law on February 18 and 25, 2022.

**Exhibit Q**

131. Disney denied both exemptions.   It provided no reason at all for denying an exemption based on Ms. Hayes' sincerely held religious beliefs; and Disney did not accept her medical accommodation request. Only after Ms. Hayes hired counsel to assist her, did Disney respond on March 25, 2022 that "she did not provide adequate documentation from a health care provider supporting her request" and that "the company was unable to determine whether Ms. Hayes was prevented from receiving the COVID-19 vaccine due to a sincerely held religious belief, practice, or observance," which led to denial of both accommodation requests.

132. Not to be deterred from working in her dream company, Ms. Hayes yet again applied for another new position as Senior Analyst Revenue Management Projects in the Revenue Management organization and was approved through the interview process up to receiving an offer in mid-September of 2022.

133. Disney informed Ms. Hayes that this offer was contingent upon her passing a background check, biometrics, and a Covid-19 vaccine requirement.   For a third time, Ms. Hayes asserted her exemption request, informing Disney that she had religious basis to refuse the

Covid-19 vaccine and that she understood Florida law to prohibit Disney from precluding her employment based on the Covid-19 vaccine.

134. Without any communication with Ms. Hayes, nor asking her for any documentation or exemption request pursuant to Fl. Stat. §381.00317, Disney's recruiter working with Ms. Hayes entered a request on her behalf for religious accommodation.   On September 26, 2022, he notified her that her accommodations were again denied.

135. Ms. Hayes submitted her claims to EEOC.   She received her Notice of Right to Sue on September 30, 2022.

## FACTS RELEVANT TO PLAINTIFF CATHRYN KOEPKE'S CLAIMS

136. Plaintiff Cathryn Koepke found her dream job with Disney despite the Covid-19 pandemic. In summer of 2021, Ms. Koepke was hired as a Senior Recruiter with Disney Human Resources Services Co., LLC, reporting to Florida management.   Her role was 100% virtual.

137. Almost immediately after her hiring, Disney announced its vaccinate-or-terminate mandate in July 2021.   Disney subjected Ms. Koepke to the mandate, despite her employment role being completely remote.

138. On October 18, 2021, Ms. Koepke filed her request for accommodations from the Covid-19 vaccine on the basis of her religious belief and medical concerns with allergies, given her very severe reaction to the influenza vaccine in 2019.   Ms. Koepke purchased detailed diagnostic allergy testing in support of her request for accommodation.

139. Throughout November 2021 and into January 2022, Disney contacted Ms. Koepke to ask regarding the outcome of her allergen testing.   Disney did not engage in any interactive process with Ms. Koepke regarding her religious beliefs, specifically that, pursuant to her Catholic Christian faith, she must obey God through her own conscience in matters of

medical intervention and her God-given physical body.   As such, she must assess whether medical intervention is morally appropriate personally with God in prayer, and that it is her moral duty to refuse the use of medical products derived from or in any way utilizing human cells from aborted children.   **Exhibit R.**

140. Despite the adequacy of Ms. Koepke's accommodations requests pursuant to federal and Florida law, Disney continued to press her for information under threat of termination if she did not comply with the mandate.

141. On January 11, 2022, Ms. Koepke disclosed the results of her allergen testing which revealed an autoimmune disorder which implicated risk in taking the Covid-19 vaccine.   However, her medical provider would not issue an exemption letter, due to very narrow grounds of CDC guidelines for allergens regarding the injections.

142. In the same communication to Disney, Ms. Koepke asserted her natural immunity basis for accommodation, pursuant to Florida law.   She also asserted she was willing to do what she needed to keep Disney employees safe.   Notably, she was already fully remote and never entered any Disney office in her current position; yet Disney did not view this as an adequate accommodation, contrary to all common sense.

143. Ms. Koepke also admitted to Disney she was "deathly afraid to take the vaccines" because she almost died only a few years prior due to a reaction with the flu vaccine.   No provider would guarantee Ms. Koepke her life was not in danger, and she understood that no vaccine manufacturer would bear any liability should something dire happen to her.   She also asserted her right not to take an experimental, un-FDA approved drug under coercion. As a widow with children, Ms. Koepke pleaded with Disney to understand her concern regarding

not only her own life in danger, but the possibility that her children would be left without their parents.

144. These pleas fell on deaf ears, despite Ms. Koepke already fulfilling her employment functions entirely without engaging in any face-to-face interaction.  On February 1, 2022, Disney terminated Ms. Koepke's employment.  Additionally, due to the nature of her unlawful termination for failure to take the Covid-19 vaccine under coercion, she was denied unemployment benefits.

145. Ms. Koepke filed her claims of discrimination and unlawful termination with the EEOC and received her Right to Sue Notice on October 14, 2022.

### FACTS RELEVANT TO PLAINTIFF SETH SCHMIDT'S CLAIMS

146. Plaintiff Seth Schmidt has worked at Disney for almost a decade before he was unlawfully terminated for refusing the Covid-19 vaccine on religious faith grounds.

147. Mr. Schmidt worked as an Operations ride host since 2013 at Disney's Hollywood Studios. When Disney shut down during the 2020 Covid-19 pandemic, he was unable to continue his job remotely.  Thus, when Disney reopened the parks, Mr. Schmidt returned to in-person work as an "essential position" and abided by the Covid-19 protocols applicable to all cast members.

148. Then, in July 2021, when Disney imposed its Covid-19 mandate, Mr. Schmidt submitted his religious exemption request to Disney on September 5, 2021.   **Exhibit S.**

149. The request for exemption was signed by Mr. Schmidt's pastor and expressly announced to Disney that Mr. Schmidt was exercising his constitutional, federal and state rights to assert an exemption on grounds of religious belief and practice.  He stated, "My personal convictions are inspired by my study and understanding of the Bible, and personally directed

by the true and living God. I am personally convicted that I should not receive any of the three Covid-19 shots presently authorized by the FDA under the Emergency Use Authorization." **Exhibit S**

150. Mr. Schmidt also clarified that he believes religious conviction in the matter of putting things into his body is a personal matter, and his study of scripture in prayer dictated that he could not risk harm to his body: "We are commanded to take good care of [the body], not to defile it, and certainly not to introduce something into it that could potentially harm it." One manner in which the Covid-19 mRNA vaccines would violate Mr. Schmidt's religious beliefs is in how they "alter what God has made" as gene therapy. Finally, he also acknowledged it would be morally wrong for him to take injections in which "fetal stem cell lines from aborted babies were used in either the initial development and/or testing of the Covid-19 shots." He cited many scripture verses including, but not limited to: Acts 2:38-39; 1 Corinthians 3:16-17; 1 Corinthians 6:19-20; 2 Corinthians 5:10; 2 Corinthians 7:1; and Psalms 139:13-16. **Exhibit S**

151. Disney never responded or fully processed Mr. Schmidt's request for exemption on religious grounds. Instead, his exemption was "paused" when Florida law went into effect on November 19, 2021.

152. Disney then imposed the discriminatory Augmented Protocols on Mr. Schmidt, contrary to the policy applied to all cast members for Covid-19 safety protocols, under which he had been successfully performing his job functions for a year.

153. Mr. Schmidt found that wearing face covering and safety glasses except when eating sufficiently distanced from other cast members ostracized him. He noted that cast members began to talk about "the unvaccinated" and there was significant social rift in the cast.

154. On September 5, 2021, Mr. Schmidt submitted to Disney a statement declaring that Disney's coercion to take the Covid-19 vaccine was forcing him to get medical treatment against his will and conscience and against his First Amendment constitutional right.   He requested that a representative of Disney sign the statement "making clear the fact that from the moment I get the vaccine this corporation will be held responsible for any illness or sickness that results from the vaccine from this moment to the day of my death."   **Exhibit T.**

155. No representative of Disney signed the document.   Instead, Mr. Schmidt was called into a meeting on December 2, 2021 and asked why he was not complying with the Augmented Protocols.   He was suspended for investigation.

156. On December 9, 2021, Mr. Schmidt was called back to his manager's office and informed that because he did not verify in the TrustAssure system, and he did not submit to the Augmented Protocol policy, he was terminated from his position.

157. Mr. Schmidt submitted his claims to the EEOC, simultaneously filing with the FCHR.   He received his Notice of Right to Sue on October 11, 2022.


## COUNT I
## FLORIDA PRIVATE WHISTLEBLOWER STATUTE
## FL. STAT. §448.101, et seq.
*Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt*
*Against Defendants The Walt Disney Company, Walt Disney Parks & Resorts, U.S., Inc., Disney Vacation Club Management, LLC, and Disney Parks, Experiences, and Products, Inc.*

158. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

159. Florida Statute §448.102 prohibits an employer taking "any retaliatory personnel action against an employee because the employee has: (1)   Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection

does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice. (2)   Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer. (3)   Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

160. The statute defines "retaliatory personnel action" as "discharge, suspension, or demotion by an employer of an employee or any other adverse employment action taken by an employer against an employee in the terms and conditions of employment."   Fl. Stat. §448.101(5).

161. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have provided on multiple occasions their written notice to Disney of Disney's unlawful acts and their intention to and actual filing of claims to appropriate governmental authorities against Disney for those unlawful acts.

162. Plaintiffs Andreas, Cribb, Pajer, and Gibbons have each filed claims under certification of Disney's *de facto* violation of Covid-19 vaccination prohibition with the PEVMP, and informed Disney of the same.

163. Plaintiffs have each filed their claims under oath of religious discrimination and retaliation before the FCHR and/or EEOC, or both concurrently.

164. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiffs.

165. Subsequent to each of Plaintiffs' repeated requests for Disney to address their concerns and cease its discriminatory policies, Disney instead fabricated charges against Plaintiffs, suspending Mr. Cribb, Mr. Pajer, and Mr. Schmidt "pending investigation."

166. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have never had a proper investigation of their claims and were subsequently terminated on pretextual grounds. Disney's suspension and termination of plaintiffs is retaliatory for their vocal and persistent, lawful challenges to Disney's unlawful conduct.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT II
## FLORIDA WHISTLE-BLOWER'S ACT
### FL. STAT. § 112.3187, et seq.
*Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt*
*Against Defendants The Walt Disney Company, Reedy Creek Improvement District, Walt Disney Parks & Resorts, U.S., Inc., Disney Vacation Club Management, LLC, and Disney Parks, Experiences, and Products, Inc.*

167. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

168. In the alternative to Disney as a private business, as pled in this Complaint, Defendant The Walt Disney Company, by virtue of its total control and ownership over local Florida public entity and governmental agency RCID, is a state agency and subject to Fl. Stat. § 112.3187.

169. All other Defendants, as subsidiaries of The Walt Disney Company and as the entities through which The Walt Disney Company engages in its business in Florida, including within the jurisdiction of the RCID, are collectively, together with The Walt Disney Company, a local Florida public entity and governmental agency, subject to Fl. Stat. § 112.3187.

170. The Florida Whistle-blower's Act prohibits a public entity "from taking retaliatory action against an employee who reports to an appropriate agency violations of law."   Fl. Stat. § 112.3187(2).   An agency "shall not dismiss, discipline, or take any other adverse personnel action…[nor]   take any adverse action that affects the rights or interest of a person in retaliation for the person's disclosure of information" identified in the Act. *Id.* at (4)(a)-(b).

171. The Act covers disclosure of information that includes:

   a.   Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee of an agency which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

   b.   Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds…or gross neglect of duty committed by an employee or agent of an agency.

   Fl. Stat. § 112.3187(5).

172. The employee's disclosure of protected information concerning a local governmental entity, including a public entity such as Disney, must be to the chief executive officer (Fl. Stat. § 447.203(9)) or other appropriate local officials. Fl. Stat. § 112.3187(6). The "other appropriate local officials," include supervisors and upper management for Plaintiffs.

173. The Act protects employees "who refuse to participate in any adverse action prohibited by this section" and "file any written complaint to their supervisory officials."   Fl. Stat. § 112.3187(7).   "Adverse personnel action" means the discharge, suspension, transfer, or demotion of any employee or the withholding of bonuses, the reduction in salary or

benefits, or any other adverse action taken against an employee within the terms and conditions of employment by an agency or independent contractor.   §112.3187(3)(c).

174. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have provided on multiple occasions their written notice to Disney through their upline supervisors and managers of Disney's unlawful acts and their intention to and actual filing of claims to governmental authorities against Disney for those unlawful acts.

175. Plaintiffs Andreas, Cribb, Pajer, and Gibbons have each filed claims under certification of Disney's *de facto* violation of Covid-19 vaccination prohibition with the PEVMP, and informed Disney of the same.

176. Plaintiffs have each filed their claims under oath of religious discrimination and retaliation before the FCHR and/or EEOC, or both concurrently.

177. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiffs.

178. Subsequent to each of Plaintiffs' repeated requests for Disney to address their concerns and cease its discriminatory policies, Disney instead fabricated charges against Plaintiffs, suspending Mr. Cribb, Mr. Pajer, and Mr. Schmidt "pending investigation."

179. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have never had a proper investigation of their claims and were subsequently terminated on pretextual grounds.   Disney's suspension and termination of plaintiffs is retaliatory for their vocal and persistent, lawful challenges to Disney's unlawful conduct.

180. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have exhausted their administrative remedies prior to bringing this claim before this Court.   Fl. Stat. § 112.3187(8).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against

Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT III
## DISCRIMINATION CONTRARY TO FLORIDA CIVIL RIGHTS ACT
### FL STAT § 760.07, § 760.10
### *All Plaintiffs Against All Defendants.*

181. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

182. The Florida Civil Rights Act ("FL CRA") prohibits an employer from discriminating against an employee "because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations." Fl. Stat. § 760.07.

183. Prohibited employment practices include:

a. "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

b. "(1)(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

    c.    "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status or to classify or refer for employment any individual on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

    d.    "(6) to print, or cause to be printed or published, any notice or advertisement relating to employment, membership, classification, referral for employment, or apprenticeship or other training, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, pregnancy, national origin, age, absence of handicap, or marital status."

Fl. Stat. § 760.10.

184. Disney is subject to FL CRA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…."  Fl. Stat. § 760.02(7).

185. Disney engaged in prohibited employment practices under FL CRA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination and Disney's perception of their "handicap" relating to or arising from their lack of Covid-19 vaccination.

186. Disney engaged in prohibited employment practices under FL CRA when it failed to accommodate Plaintiffs Hayes and Koepke, particularly when accommodation would have been equivalent to *status quo* of their fully remote positions, after denying their religious and medical accommodations requests.

187. Disney engaged in prohibited employment practices under FL CRA when, upon denying

their religious and medical accommodations for Ms. Hayes and Ms. Koepke, Disney unlawfully terminated their employment.

188. Disney engaged in prohibited employment practices under FL CRA when, upon Florida law prohibiting Covid-19 vaccinate-or-terminate mandates went into effect, Disney began a program under "Augmented Health & Safety Protocols" by which Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt with religious beliefs prohibiting taking the Covid-19 vaccine would be segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

189. Disney engaged in prohibited employment practices under FL CRA when it refused to accommodate the religious beliefs of Plaintiff Andreas which prohibited her from complying with coerced and discriminatory covering of her face.

190. Disney engaged in prohibited employment practices under FL CRA when it unlawfully terminated Ms. Andreas' employment after denying her religious accommodation against the Augmented Protocols.

191. Disney engaged in prohibited employment practices under FL CRA when it perceived all Plaintiffs as disabled and unable to complete the functions of their jobs in their medical status as unvaccinated for Covid-19 and unlawfully terminated them on the basis of this perception.

192. Disney engaged in prohibited employment practices under FL CRA by applying the discriminatory and humiliating Augmented Protocols against Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt because it perceived Plaintiffs as disabled and unable to complete the functions of their jobs in their medical status as unvaccinated for Covid-19

and therefore unlawfully segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

193. Even though Plaintiffs clearly posed no health threat to Florida Disney employees, or in the case of Ms. Hayes and Ms. Koepke, were nowhere physically present near Disney employees and guests, Disney treated Plaintiffs as though they were continually contagious vectors of disease and dangerous.

194. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Plaintiffs whom Disney perceived as disabled and dangerous to wear PPE for extended periods without respite illustrates Disney's true sentiment and message that Plaintiffs *are* the toxic substance or environmental hazard in the Disney workplace.

195. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages. Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for their religious beliefs and perceived disability.

196. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

197. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court.   Fl. Stat. § 760.11.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT IV**
**RETALIATION CONTRARY TO FLORIDA CIVIL RIGHTS ACT**
**FL STAT § 760.10(7), § 760.10**
*Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt*
*Against Defendants The Walt Disney Company, Reedy Creek Improvement District, Walt Disney Parks & Resorts, U.S., Inc., Disney Vacation Club Management, LLC, and Disney Parks, Experiences, and Products, Inc.*

198. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

199. The Florida Civil Rights Act ("FL CRA") prohibits an employer's "discriminat[ing] against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.."   Fl. Stat. § 760.10(7).

200. Disney is subject to FL CRA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…."   Fl. Stat. § 760.02(7).

201. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have provided on multiple occasions their written notice to Disney through their upline supervisors and managers of Disney's unlawful acts and their intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts.   Disney subsequently disciplined, suspended, and/or

terminated Plaintiffs' employment in violation of FL CRA.

202. Plaintiffs Andreas, Cribb, Pajer, and Gibbons have each filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the PEVMP, and informed Disney of the same.

203. Plaintiffs have each filed their claims under oath of religious discrimination and retaliation before the FCHR and/or EEOC, or both concurrently.

204. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiffs.

205. Subsequent to each of Plaintiffs' repeated requests for Disney to address their concerns and cease its discriminatory policies, Disney instead fabricated charges against Plaintiffs, suspending Mr. Cribb, Mr. Pajer, and Mr. Schmidt "pending investigation."

206. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have never had a proper investigation of their claims and were subsequently terminated on pretextual grounds. Disney's suspension and termination of plaintiffs is retaliatory for their vocal and persistent, lawful challenges to Disney's unlawful conduct.

207. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages.   Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for their religious beliefs and perceived disability.

208. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against

Disney, to deter it, and others, from such conduct in the future.

209. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court.  Fl. Stat. § 760.11.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT V
## <u>VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,<br>AS AMENDED ("TITLE VII") 42 USC §§ 2000e, *et seq*;<br>DISCRIMINATION ON THE BASIS OF RELIGIOUS BELIEF AND PRACTICE</u>
### *All Plaintiffs Against All Defendants*

210. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

211. Title VII (42 USC § 2000e-2(a)) provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

212. Religion under the statute "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue

hardship on the conduct of the employer's business." 42 USC § 2000e(j). It is well established in the law that part of religious observance and practice may involve refusal of medical treatment and vaccination.

213. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 USC §2000e(b), (g), (h) and 42 USC §12111(2), (5).

214. Disney engaged in prohibited employment practices under TITLE VII by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination.

215. Disney engaged in prohibited employment practices under TITLE VII when it failed to accommodate Plaintiffs Hayes and Koepke, particularly when accommodation would have been equivalent to *status quo* of their fully remote positions, after denying their religious accommodations requests.

216. Disney engaged in prohibited employment practices under TITLE VII when, upon denying their religious accommodations for Ms. Hayes and Ms. Koepke, Disney unlawfully terminated their employment.

217. Disney engaged in prohibited employment practices under TITLE VII when, upon Florida law prohibiting Covid-19 vaccinate-or-terminate mandates went into effect, Disney began a program under "Augmented Health & Safety Protocols" by which Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt with religious beliefs prohibiting taking the Covid-19 vaccine would be segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

218. Disney engaged in prohibited employment practices under TITLE VII when it refused to accommodate the religious beliefs of Plaintiff Andreas which prohibited her from complying with coerced and discriminatory covering of her face.

219. Disney engaged in prohibited employment practices under TITLE VII when it unlawfully terminated Ms. Andreas' employment after denying her religious accommodation against the Augmented Protocols.

220. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages. Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for their religious beliefs.

221. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

222. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court.  42 USC § 2000e-5.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT VI**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**AS AMENDED ("TITLE VII") 42 USC §§ 2000e, *et seq*;**
**RETALIATION**
*Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt*
*Against Defendants The Walt Disney Company, Walt Disney Parks & Resorts, U.S., Inc., Disney*
*Vacation Club Management, LLC, and Disney Parks, Experiences, and Products, Inc.*

223. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

224. Title VII (42 U.S.C. § 2000e-3(a)) prohibits retaliation against an employee for opposing an employer's unlawful action prohibited by Title VII: "It shall be an unlawful employment practice for an employer… to discriminate against any individual… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

225. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 USC §2000e(b), (g), (h) and 42 USC §12111(2), (5).

226. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have provided on multiple occasions their written notice to Disney through their upline supervisors and managers of Disney's unlawful acts and their intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts.   Disney subsequently disciplined, suspended, and/or terminated Plaintiffs' employment in violation of Title VII.

227. Plaintiffs Andreas, Cribb, Pajer, and Gibbons have each filed claims under certification of Disney's *de facto* violation of Covid-19 vaccination prohibition with the PEVMP, and informed Disney of the same.

228. Plaintiffs have each filed their claims under oath of religious discrimination and retaliation

before the FCHR and/or EEOC, or both concurrently.

229. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiffs.

230. Subsequent to each of Plaintiffs' repeated requests for Disney to address their concerns and cease its discriminatory policies, Disney instead fabricated charges against Plaintiffs, suspending Mr. Cribb, Mr. Pajer, and Mr. Schmidt "pending investigation."

231. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have never had a proper investigation of their claims and were subsequently terminated on pretextual grounds.  Disney's suspension and termination of plaintiffs is retaliatory for their vocal and persistent, lawful challenges to Disney's unlawful conduct.

232. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages.   Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for their religious beliefs.

233. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

234. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court.   42 USC § 2000e-5.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary

documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT VII**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990,**
**AS AMENDED ("ADA") 42 USC §§ 12111, *et seq*;**
**DISCRIMINATION ON THE BASIS OF PERCEIVED DISABILITY**
*All Plaintiffs Against All Defendants*

235. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

236. Plaintiffs are "qualified individuals" who were employees of Disney, as defined under the ADA. 42 USC § 12111(4), (8).   Plaintiffs performed the essential functions of their positions admirably for the span of their respective careers, from less than a year to over two decades, and for all Plaintiffs employed by Disney prior to its Covid-19 vaccine mandate imposed in July 2021, each performed the essential functions of his or her position using Disney's universally applied Covid-19 safety policies for protection.   In Ms. Hayes' and Ms. Koepke's employment, each were 100% remote in their position.

237. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 USC §2000e(b), (g), (h) and 42 USC §12111(2), (5).

238. The ADA prohibits discrimination against disabled persons in the employment context.   An employee is considered to have a disability if he or she: has "(A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment…." 42 U.S.C § 12102(1).

239. To establish a disability under the third definition, being regarded as having an impairment, the ADA provides:

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42  SC § 12102(3).

240. At all relevant times material to this action, Covid-19 was a well-known, highly contagious, and sometimes deadly virus that has resulted in a global pandemic.   Furthermore, Disney's strictly enforced vaccinate-or-terminate policy for Covid-19 injections confirms its position that Covid-19 infection and transmission is a serious, ongoing concern.

241. Plaintiffs all objected to Disney's mandatory covid-19 vaccination, each submitting his or her request for (religious and/or medical) exemption, and being willing to discuss reasonable accommodation with Disney, if Disney had been willing to do so.

242. Disney engaged in prohibited employment practices under ADA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of Disney's perception of their "handicap" relating to or arising from their lack of Covid-19 vaccination.

243. Disney engaged in prohibited employment practices under the ADA when it perceived all Plaintiffs as disabled and unable to complete the functions of their jobs in their medical status as unvaccinated for Covid-19 and unlawfully terminated them on the basis of this perception.

244. Disney engaged in prohibited employment practices under ADA by applying the

discriminatory and humiliating Augmented Protocols against Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt because it perceived Plaintiffs as disabled and unable to complete the functions of their jobs in their medical status as unvaccinated for Covid-19 and therefore unlawfully segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

245. Even though Plaintiffs clearly posed no health threat to Florida Disney employees, or in the case of Ms. Hayes and Ms. Koepke, were nowhere physically present near Disney employees and guests, Disney treated Plaintiffs as though they were continually contagious vectors of disease and dangerous.

246. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Plaintiffs whom Disney perceived as disabled and dangerous to wear PPE for extended periods without respite illustrates Disney's true sentiment and message that Plaintiffs *are* the toxic substance or environmental hazard in the Disney workplace.

247. Disney's assumption of Plaintiffs' risk in the workplace is not based on any reasonable understanding of the facts regarding their ability to perform their essential job duties with or without accommodation. Defendant failed to make any individualized risk assessment regarding each Plaintiff's perceived disability. There was no factual support for the idea that Plaintiffs could not perform their essential job duties as they had, in some cases, for decades, and in fact during the Covid-19 pandemic.

248. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages.

Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for a perceived disability.

249. Disney's conduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

250. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court.   42 USC § 2000e-5.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT VIII
## VIOLATION OF THE ADA, 42 USC §§ 12203; PROHIBITED RETALIATION AND COERCION
### *Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt*
### *Against Defendants The Walt Disney Company, Walt Disney Parks & Resorts, U.S., Inc., Disney Vacation Club Management, LLC, and Disney Parks, Experiences, and Products, Inc.*

251. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

252. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt are "qualified individuals" who were employees of Disney, as defined under the ADA. 42 USC § 12111(4), (8).

253. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining

a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 USC §2000e(b), (g), (h) and 42 USC §12111(2), (5).

254. The ADA prohibits retaliation and coercion for protected activities:

> (a) Retaliation
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
>
> (b) Interference, coercion, or intimidation
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 USC § 12203.

255. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have provided on multiple occasions their written notice to Disney through their upline supervisors and managers of Disney's unlawful acts and their intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts.   Disney subsequently disciplined, suspended, and/or terminated Plaintiffs' employment in violation of the ADA.

256. Plaintiffs Andreas, Cribb, Pajer, and Gibbons have each filed claims under certification of Disney's *de facto* violation of Covid-19 vaccination prohibition with the PEVMP, and informed Disney of the same.

257. Plaintiffs have each filed their claims under oath of religious discrimination and retaliation before the FCHR and/or EEOC, or both concurrently.

258. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiffs.

259. Subsequent to each of Plaintiffs' repeated requests for Disney to address their concerns and cease its discriminatory policies, Disney instead fabricated charges against Plaintiffs, suspending Mr. Cribb, Mr. Pajer, and Mr. Schmidt "pending investigation."

260. Plaintiffs Andreas, Cribb, Pajer, Gibbons, and Schmidt have never had a proper investigation of their claims and were subsequently terminated on pretextual grounds. Disney's suspension and termination of plaintiffs is retaliatory for their vocal and persistent, lawful challenges to Disney's unlawful conduct.

261. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiffs' equal employment opportunities and their economic and non-economic damages. Disney's unlawful conduct has caused Plaintiffs damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of their civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for their religious beliefs.

262. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiffs so as to entitle them to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

263. Plaintiffs have exhausted their administrative remedies prior to bringing this claim before this Court. 42 USC § 2000e-5.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, order Disney to reinstate their employment, order Disney to remove disciplinary documentation in Plaintiffs' file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and

costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT IX**
**DECLARATORY JUDGMENT**
**DISNEY VIOLATED EMPLOYEES' FLORIDA CONSTITUTIONAL**
**RIGHT TO PRIVACY ART I, § 23.**
*All Plaintiffs Against All Defendants.*

264. Paragraphs 1-157 are hereby incorporated by reference as if fully restated.

265. As pled in this Complaint, Defendant The Walt Disney Company, by virtue of its total control and ownership over local Florida public entity and governmental agency RCID, is a state agency and subject to limitations and obligations of public entities under the Florida Constitution.

266. All other Defendants, as subsidiaries of The Walt Disney Company and as the entities through which The Walt Disney Company engages in its business in Florida, including within the jurisdiction of the RCID, are collectively, together with The Walt Disney Company, a local Florida public entity and governmental agency, subject to Florida's constitutional restrictions.

267. Disney's vaccinate-or-terminate mandate is unlawful because

- it violates the Plaintiffs' constitutional right to privacy and bodily autonomy guaranteed by the Florida Constitution, Article I, Section 23;

- it violates the Plaintiffs' constitutional right to due process and equal protection of the law guaranteed by the Florida Constitution Article I, Sections 2 and 9;

- it interferes with Plaintiffs' exercise or enjoyment of constitutional and statutory rights using threats, intimidation, or coercion - Fl. Stat. § 760.51;

- it violates Fl. Stat. § 381.00315, which grants sole governmental authority in Florida to issue vaccine mandates to the "State Health Officer;"

- it violates Fl. Stat. §§ 381.0016, 112.0441, which forbid local governments and public employers from imposing vaccine mandates on their employees; and

- it is not narrowly tailored to serve a compelling public health or safety purpose as is required under Fl. Stat. § 252.38(4)(b).

268. There is a *bona fide*, actual, present and practical need for the declaration.   Disney continues to impose a Covid-19 vaccine mandate against all recruits and new hires, including Plaintiff Hayes who sought rehire by Disney and was denied.   Furthermore, while Disney "paused" enforcement of its Covid-19 vaccine mandate in November 2021, the law which stayed Disney's enforcement is set to expire in 2023 without legislative action.

269. The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to whether the Disney's vaccinate-or-terminate mandate violates Plaintiffs' constitutional liberties and is otherwise unlawful.

270. An immunity, power, privilege or right of Plaintiffs is dependent on the facts or the law applicable to the facts.

271. Plaintiffs and Disney have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

272. The antagonistic and adverse interests are all properly before the Court.

273. The relief sought is not merely the giving of legal advice or the answer to questions propounded from curiosity.

WHEREFORE, Plaintiffs seek a declaratory judgment stating that Disney's Covid-19 vaccinate-or-terminate mandate violates Plaintiff's privacy rights under the Florida constitution and is otherwise unlawful; and an award to Plaintiffs for their attorney's fees and costs; and order all such

further relief as the Court deems necessary and just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated this 23d day of December, 2022.

RACHEL L.T. RODRIGUEZ, ESQ.
Florida Bar Number:110425
VIRES LAW GROUP, PLLC
515 N. Flagler Dr. Ste P300
West Palm Beach, FL 33401
(561) 370-7383
rrodriguez@vireslaw.group

CARROLL G. SANDERS, ESQ.
Florida Bar Number: 52846
CGS LAW, P.A.
1101 E Cumberland Ave, Ste. 201H-133
Tampa, Florida 33602
(813) 279-8491
Carroll@CGSLAW.org

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

Pursuant to agreement, I Rachel L.T. Rodriguez, Esq. certify that I have provided this First Amended Complaint to Defendants Walt Disney Parks and Resorts, U.S., Inc. and Disney Vacation Club Management, LLC this 23d day of December, 2022 via waiver of service requests to Shutts & Bowen, LLP at 300 S. Orange Avenue, Suite 1600 Orlando, FL 32801-5403; and there being no other counsel entered on behalf of The Walt Disney Company or Disney Parks, Experiences, and Products, Inc., since service thereto of the initial complaint, and the remaining Defendants are newly entered in this amended pleading, service will be effectuated by waiver of service requests to the registered agents thereof.

_____/S/Rachel L.T. Rodriguez_____
Counsel for Plaintiffs

## **VERIFICATION**

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated

in it are true, to the best of my knowledge and belief. Signed this 23 day of ___December___ 2022.

*Barbara Andreas*
Barbara Andreas (Dec 23, 2022 09:42 EST)

BARBARA ANDREAS

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated

in it are true, to the best of my knowledge and belief. Signed this 22 day of _December_ 2022.

*Stephen J Cribb*

STEPHEN J. CRIBB

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated

in it are true, to the best of my knowledge and belief. Signed this 22 day of ___December___ 2022.

Adam Pajer (Dec 23, 2022 02:01 EST)

ADAM PAJER

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated

in it are true, to the best of my knowledge and belief. Signed this 22 day of ___December___ , 2022.

steve gibbons (Dec 23, 2022 01:43 EST)

STEVEN GIBBONS

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true, to the best of my knowledge and belief. Signed this 23 day of December , 2022.

_____

CHERON HAYES


Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true, to the best of my knowledge and belief. Signed this 2 2 day of December, 2022.

_____

CATHRYN KOEKPE


Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true, to the best of my knowledge and belief. Signed this 23 day of December , 2022.

_____

SETH SCHMIDT

# EXHIBIT A

# Protocols Reminder



**COVID-19 Scenarios for DPEP Cast Working at the Florida Site**

## COVID-19 SCENARIOS FOR DPEP CAST WORKING AT FLORIDA SITE
### (Regardless of vaccination status)

**POSITIVE COVID-19**
- Isolate at home and do not report to work for five days, or longer if symptoms continue. After the isolation period, you must wear a face covering (indoors and outdoors) for an additional five days. During those additional five days at work, maintain six-feet physical distancing when your face covering is temporarily removed to actively eat and drink. Immediately open a COVID-19 inquiry in D Tools HR to report your COVID-19 case.
  - Please send your positive COVID test result to DPEP.Contact.Tracing@disney.com.
- If you are unable to wear a face covering while working, you must isolate at home and not report to work for ten days, or longer if symptoms continue.

**EXPOSED TO COVID-19 AND SYMPTOMATIC**
- Quarantine at home and do not report to work for five days, or longer if symptoms continue. After the quarantine period, you must wear a face covering (indoors and outdoors) for an additional five days. During those additional five days at work, maintain six-feet physical distancing when your face covering is temporarily removed to actively eat and drink. If possible, get tested for COVID-19. Open a COVID-19 inquiry in D Tools HR to report your exposure.
- If you are unable to wear a face covering while working, you must stay at home and not report to work for ten days following exposure, or longer if symptoms continue.

**EXPOSED TO COVID-19 AND ASYMPTOMATIC**
- Continue to report to work if you do not have symptoms. You must wear a face covering (indoors and outdoors) for 10 days following the exposure, and maintain six-feet physical distancing when your face covering is temporarily removed to actively eat and drink. If possible, get tested for COVID-19 five days after exposure.
- If you are unable to wear a face covering while working, you must stay at home and not report to work for ten days following exposure.

**NEGATIVE COVID-19, BUT DISPLAYING SYMPTOMS OR SICK**
- Stay at home and do not report to work until well. Follow your standard call-in procedures. There is no need to contact GHRO unless you become symptomatic or positive for COVID-19.

# EXHIBIT B

# Important Company Message

Friday, July 30, 2021

 CONTRIBUTED BY
**Paul Richardson**
Senior Executive Vice President and Chief Human Resources Officer, The Walt Disney Company

english • español • kreyòl ayisyen

Dear Colleague,

One thing that has remained true and constant during the course of the COVID-19 pandemic is how quickly things can change. This has been an incredibly challenging time for everyone, and it requires agility, flexibility and perseverance.

We've been closely monitoring the impact of the pandemic on our communities and, as always, we believe it is important to put the safety of our Employees and Cast Members at the forefront.

Toward that end, and based on the recommendations of scientists, health officials and our own medical professionals that the COVID-19 vaccine provides the best protection against severe infection, we are now requiring that all salaried and non-union hourly employees in the U.S. working at any of our sites be fully vaccinated. Employees who aren't already vaccinated and are working on-site will have 60 days from today to complete their protocols and any employees still working from home will need to provide verification of vaccination prior to their return, with certain exceptions.

We have also begun conversations around this topic with the unions representing our employees under collective bargaining agreements. In addition, all new hires will be required to be fully vaccinated before beginning employment.

We are developing plans and protocols for employees outside the U.S.

You can find information about COVID-19 vaccines on the Staying Healthy site.

We are also adjusting the return-to-office timeline we announced at the end of June. We have decided to delay that return for now and those who are working remotely should continue to do so. Leaders and HR business partners will contact employees who have recently been asked to come back to the office with specific next steps. Each of our businesses and locations will determine what is best for its workforce given local conditions. As promised, we will try to provide a minimum of 30-days' notice to help you successfully plan to be back in the office when the time comes.

I know you'll have questions about our policies, including limited exceptions, and future plans. Information can be found on the Moving Forward, Together site. We will provide more details as soon as they are determined.

Thank you for your flexibility and understanding as we navigate this phase of the pandemic. Stay safe.

Best,

Paul

# EXHIBIT C

**From:** Disney Health and Safety Team <Disney.Health.and.Safety.Team@twdc.com>
**Date:** November 19, 2021 at 2:07:00 PM EST
**To:** adampajer@icloud.com
**Subject: Update on Company Vaccination Policy**
**Reply-To:** TWDC.GHRO.Services@disney.com

This update is being shared with you based on your residence and/or work in Florida and because you have not yet verified your COVID-19 vaccination status with the company and you have not been granted an accommodation.

As you know, in July the company announced that based on the recommendations of scientists, health officials, and our own medical professionals that the COVID-19 vaccine provides the best defense against the virus, the company was implementing a mandatory vaccination policy. Under our policy, all U.S.-based salaried and hourly non-union employees, as well as employees covered by a collective bargaining agreement that adopts this policy, are required to be fully vaccinated against COVID-19 as a condition of their continued employment. The company's view of the wisdom of that approach has not changed.

We remain confident in the approach we have taken with our mandatory vaccine policy for Florida-based Cast Members and employees, with more than 90% of our active Florida-based Cast Members and employees having verified that they are fully vaccinated, and we consider this to be very successful.

Due to the passage this week of a new Florida law on employer vaccine mandates, and the federal OSHA Emergency Temporary Standard mandating the vaccine being stayed, we must pause the enforcement of our policy for Florida-based Cast Members and employees.

Specifically,

- As we assess the full impact of this new legislation, we are immediately pausing the enforcement of our mandatory vaccination policy for Florida-based Cast Members and employees until further notice.
- If you have not verified that you are fully vaccinated, you will be required to follow our safety protocols for unvaccinated Cast Members and employees, including face coverings and physical distancing.
- While you do not currently have to verify vaccination status, you may still do so through the TrustAssure process. Cast Members and employees who do not verify vaccination status through the TrustAssure process will be considered as unvaccinated.
- If you have made a request for an accommodation exempting you from the company's vaccine mandate, that request will be considered on hold for the time being and will not be evaluated by the company. Should the company later resume its accommodations process in Florida, your request for accommodation will be evaluated at that time.

Further updates will be provided at a later date.

Thank you for your flexibility and understanding as we navigate this phase of the pandemic. Please contact your HR business partner if you have any questions.

# EXHIBIT D

# LEADER RESOURCE



**Augmented Safety Protocols**

**Date:** Dec 10, 2021                                        ***FOR VERBAL USE ONLY***

**FOR**: DPEP salaried leaders of Cast Members who must follow Augmented Safety Protocols at WDW

**\*\* Do not copy, forward or post this information. \*\***

| | |
|---|---|
| ***Summary*** | Beginning Dec. 13, select salaried leaders at Walt Disney World Resort will begin receiving a weekly email notification **if they have a Cast Member(s) who is required to follow Augmented Safety Protocols**. The email will be <u>sent to the direct leader listed in SAP</u>. The email will have a link and requires the leader to sign in using their HUB login and password to access their list. The list should not be forwarded internally or externally and should be handled with utmost confidentiality.<br><br>Cast Members who are initially listed may come off the list if they complete the verification process through TrustAssure. This Leader Resource provides information and guidance that can be used when responding to Cast Members who have questions. |
| ***Augmented Safety Protocols*** | The following Augmented Safety Protocols must be followed while working onsite at Walt Disney World Resort:<br><br>1. Required to be six feet from others when removing a Disney-supplied face covering to actively eat or drink.<br><br>2. Whether indoors or outdoors, a Disney-supplied face covering must be worn at all times. In addition, when within three feet of others and indoors, a face shield or safety glasses must also be worn.<br>   • Cast Members can remove their face covering when:<br>     1. Alone in an office with the door shut<br>     2. Performing an approved green zone task<br>     3. While actively performing onstage in a COVID-blocked entertainment offering and maintaining six feet from others<br>     4. When six feet from others and actively eating or drinking<br><br>3. Instead of a Disney-supplied face covering (i.e., pixie), Cast Members in high contact roles are required to wear a Disney-supplied N95 mask plus a face shield or safety glasses when within three feet from others. **If your Cast Member has indoor extended interaction with any individual within three feet, please contact your local Safety Professional for further review and instructions**. Indoor extended interaction is defined as multiple interactions indoors with the same individual within three feet (no barrier) that cumulatively add up to an hour over a single shift. |
| ***Information and Process For Required N95 Mask Usage*** | • Instead of a Disney-supplied face covering (i.e., pixie), **Cast Members in high contact roles are required to wear a Disney-supplied valveless N95 mask plus a face shield or safety glasses when within three feet from others**. |

# LEADER RESOURCE

**Walt Disney World**

**Augmented Safety Protocols**

**Date:** Dec 10, 2021                                          ***FOR VERBAL USE ONLY***

**FOR**: DPEP salaried leaders of Cast Members who must follow Augmented Safety Protocols at WDW

| | |
|---|---|
| *Information and Process For Required N95 Mask Usage (continued)* | **Process for Cast Members required to wear a Disney-supplied valveless N95 mask**: <br><br> • Leader should contact their local Safety Professional to review the Cast Member's role and verify that it meets the criteria of a high contact role. If the Safety Professional confirms the criteria, then the leader should contact the Coordinator of Training (COT) to enroll the Cast Member in the required training and to complete a fit test at Health Services. <br><br> • Leader confirms with the Cast Member they understand the requirement and reviews the protocols. <br><br> • Leader **assists Cast Member with the following steps as set up by the COT**, which must be **completed on paid time**: <br><br>     1. **Complete the "Safety Protocols – N95" in D Learn** <br>         Training takes approximately 10 minutes and is available in English, Spanish, Haitian Creole and Vietnamese. Leaders may contact their local area COT for assistance as needed. <br><br>     2. **Pick up valveless N95 mask** <br>         N95 masks are available at most Costuming issue locations (if needed, the Cast Member should also pick up a face shield or safety goggles). <br><br>     3. **Visit Cast Health Services for mask-wearing procedures** <br>         An appointment must be made with Cast Health Services, where Cast will bring their valveless N95 mask to ensure a proper fit and learn the appropriate wearing procedures. Upon completion, Health Services will mark this as a completed training requirement in D Learn. <br><br>     4. **Cast Member completes "N95 Acknowledgement" in D Learn** |
| *The Leader's Role* | • As a reminder, leaders are required as part of their regular day-to-day responsibilities to **enforce applicable safety protocols**. Leaders know their Cast Members best and how to assist and provide additional guidance as needed. If you observe a Cast Member who is not adhering to the safety protocols, immediately address the situation as a safety violation. Show care and compassion by having the conversation in a private setting whenever possible, given the potential for the discussion to turn to sensitive topics. <br><br>     o Failure to adhere to these protocols is considered a safety violation, which can result in disciplinary action up to termination. <br><br>     o If a Cast Member refuses to follow instructions about these protocols, it will be considered insubordination, which can result in termination. <br><br> • **Familiarize yourselves with the Augmented Safety Protocols** (as listed above). <br><br> • **Ensure all required training is complete**, including for Cast who must use a N95 mask. |

# LEADER RESOURCE



| **Augmented Safety Protocols** | |
| --- | --- |
| **Date:** Dec 10, 2021 | ***FOR VERBAL USE ONLY*** |
| **FOR**: DPEP salaried leaders of Cast Members who must follow Augmented Safety Protocols at WDW | |

|  | **Leader Call-to-Action** |
| --- | --- |
|  | • Leadership presence is so important; thank you for continuing to walk all work areas and breakrooms on a regular basis to help answer questions and visually scan for compliance. |
|  | • If you observe a Cast Member who is not adhering to the safety protocols, immediately address the situation as a safety violation. Address any situations courteously and discreetly, and bring the Cast Member into a private setting whenever possible. |
|  | • As always, engage your direct leader, local area HR Business Partner or Safety Professional if you have any questions or need additional support. |
| *Reactive Cast FAQs* | **Why do I have to follow Augmented Safety Protocols? Why do I have to wear a face covering and a face shield or safety glasses?** <br> These safety protocols are in place for those who have not verified their vaccination status through TrustAssure. <br><br> **I already have an approved accommodation; do I need to do anything differently?** <br> Cast with an approved accommodation should continue to follow safety protocols communicated to them. <br><br> **Does the new Florida law allow for these Augmented Safety Protocols?** <br> Yes. We have paused until further notice the enforcement of our mandatory vaccine  policy for Florida-based Cast Members and employees. However, we continue to focus on the safety and well-being of our Cast Members and Guests and remain committed to implementing safety protocols that help prevent the spread of the COVID-19 virus. <br><br> **Why are some Cast required to wear a N95 mask instead of a Disney-supplied face covering?** <br> These safety protocols are in place for those who have not verified their vaccination status through TrustAssure. A N95 mask is required for higher contact roles with indoor extended interaction with another individual. <br><br> **What happens if I don't follow the Augmented Safety Protocols?** <br> Non-compliance with the Augmented Safety Protocols may result in disciplinary action, up to and including termination. <br><br> **Do these Augmented Safety Protocols apply to Cast who verified their vaccination status through TrustAssure?** <br> No. |

# EXHIBIT E



**9205+/9210+/*37192,
9211+/37193***

# Aura™ Particulate Respirator N95

*User Instructions*
**IMPORTANT:** *Keep User Instructions for reference*

*37192 and 37193 are catalog numbers only. NIOSH approved as 3M™ Particulate Respirator N95 9210+ and 3M™ Particulate Respirator N95 9211+. See insert for approval label.

98-0060-0208-7_2

# Respirateur N95 contre les particules Aura™

*Directives d'utilisation*
**IMPORTANT :** Conserver ces *directives d'utilisation* à titre de référence.

*Les numéros 37192 et 37193 ne sont que des numéros de référence. Homologués par le NIOSH sous les désignations suivantes : respirateur N95 9210+ 3M™ contre les particules et respirateur N95 9211+ 3M™ contre les particules. Consulter l'encart pour l'étiquette d'homologation.

# Respirador para partículas N95 Aura™

*Instrucciones*
**IMPORTANTE:** Conserve estas *Instrucciones* para referencia futura.

*37192 y 37193 sólo son números de catálogo. Aprobado por el Instituto Nacional de Seguridad y Salud Ocupacional (NIOSH por sus siglas en inglés) como Respirador para partículas 3M™ N95 9210+ y Respirador para partículas 3M™ N95 9211+. Consulte la etiqueta de aprobación en el inserto incluido.

# Aura™ 防護マスク N95

重要：参考としてこの取扱説明書を保管しておいてください。

*37192と37193はカタログ上の番号です。NIOSHは３M™防護マスク9210+N95、３M™　防護マスク9211+N95として認定しています。このマスクは労働安全衛生法に定める防じんマスクではありません。

# Aura™ 粒狀物呼吸防護口罩 N95

## 使用說明 重要：保留此份說明以供參考。

*37192 及 37193 僅為分類號碼。NIOSH 認證為 3M™ Particulate Respirator N95 9210+ 及 3M™ Particulate Respirator N95 9211+。請見內部證明標籤。

# Aura™ 안면부여과식 방진마스크 N95 등급

## 중요: 마스크 착용전에 반드시 착용방법을 읽고 숙지해야 합니다.

* 37192 와 37193 은 카다로그 참조번호입니다. 9210+ 와 9211+는 NIOSH 인증을 받은 N95등급의 방진 마스크 입니다.



### ⚠WARNING

This respirator helps protect against certain particles. **Misuse may result in sickness or death.** For correct use, consult supervisor, and *User Instructions*, or call 3M in U.S.A., 1-800-243-4630. In Canada, call Technical Service at 1-800-267-4414.

## IMPORTANT

Before use, wearer must read and understand these *User Instructions*. Keep *User Instructions* for reference.

## Use For

Particles such as those from grinding, sanding, sweeping, sawing, bagging, or processing minerals, coal, iron ore, flour, metal, wood, pollen, and certain other substances. Liquid or non-oil based particles from sprays that do not also emit oil aerosols or vapors. Follow all applicable local regulations. In the U.S, for additional information on 3M use recommendations for this class of respirator please consult the 3M Respirator Selection Guide found on the 3M PSD web site at www.3M.com/PPESafety or call 1-800-243-4630. In Canada call 1-800-267-4414.

## Do Not Use For

Do not use for gases and vapors, oil aerosols, or sandblasting, unless nozzle and blast are physically separated from the operator in an exhaust-ventilated enclosure; particulate concentrations that exceed either 10 times the occupational exposure limit or applicable government regulations, whichever is lower. This respirator does not supply oxygen. In the U.S., do not use when OSHA substance specific standards, such as those for asbestos, arsenic, cadmium, lead in the construction industry, or 4,4'-methylene dianiline (MDA), specify other types of respiratory protection.

## Biological Particles

This respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. viruses, mold, *Bacillus anthracis, Mycobacterium tuberculosis*, etc.) but cannot eliminate the risk of contracting infection, illness or disease. OSHA and other government agencies have not established safe exposure limits for these contaminants.

## Use Instructions

1. Failure to follow all instructions and limitations on the use of this respirator and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and **may result in sickness or death.**

2. Before occupational use of this respirator, in the U.S. a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134 such as training, fit testing, medical evaluation, and applicable OSHA substance specific standards. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate.

3. The particles which can be dangerous to your health include those so small that you cannot see them.

4. Leave the contaminated area immediately and contact supervisor if dizziness, irritation, or other distress occurs.

5. Store the respirator away from contaminated areas when not in use.

6. Inspect respirator before each use to ensure that it is in good operating condition. Examine all the respirator parts for signs of damage including the two headbands, staples, noseclip, and nosefoam. The respirator should be disposed of immediately upon observation of damaged or missing parts. Filtering facepieces are to be inspected prior to each use to assure there are no holes in the breathing zone other than the punctures around staples and no damage has occurred. Enlarged holes resulting from ripped or torn filter material around staple punctures are considered damage. Immediately replace respirator if damaged. Staple perforations do not affect NIOSH approval.

7. Dispose of used product in accordance with applicable regulations.

## Use Limitations

1. This respirator does not supply oxygen. Do not use in atmospheres containing less than 19.5% oxygen.

2. Do not use when concentrations of contaminants are immediately dangerous to life or health, are unknown or when concentrations exceed 10 times the permissible exposure limit (PEL) or according to specific OSHA standards or applicable government regulations, whichever is lower.

3. Do not alter, abuse, wash or misuse this respirator.

4. Do not use with beards or other facial hair or other conditions that prevent a good seal between the face and the sealing surface of the respirator.

5. Respirators can help protect your lungs against certain airborne contaminants; however, they will not prevent entry through other routes such as the skin, which would require additional personal protective equipment (PPE).

6. This respirator is designed for occupational/professional use by adults who are properly trained in their use and limitations. This respirator is not designed to be used by children.

7. Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and complete a medical evaluation prior to use.

8. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" state specified on packaging.

## Storage Conditions and Shelf Life

Before use, store respirators in the original packaging, away from contaminated areas, dust, sunlight, extreme temperatures, excessive moisture and damaging chemicals. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" date specified on packaging. Always inspect product and conduct a user seal check before use as specified in *User Instructions*. **If you cannot achieve a proper seal, do not use the respirator.**



End of Shelf Life                Use respirators before the "use by" date specified on packaging

Storage Temperature Range        -20°C (-4°F) to +30°C (+86°F).



Storage Maximum Relative Humidity        <80% RH

## Time Use Limitations

If respirator becomes damaged, soiled, or breathing becomes difficult, leave the contaminated area immediately and replace the respirator.

## Fitting Instructions

**Must be followed each time respirator is worn.**


Fig. 1a


Fig. 1b


Fig. 2


Fig. 3a


Fig. 3b


Fig. 4


Fig. 5

1.  Remove respirator from packaging and hold with straps facing upward (1a). Place bottom strap under center flaps next to **WARNING** statement as shown (1b).

2.  Fully open top and bottom panels, bending nosepiece around thumb at center of foam. Straps should separate when panels are opened. Make certain bottom panel is unfolded and completelyopened.

3. Place respirator on your face so that the foam rests on your nose and the bottom panel is open under chin. Hold the bottom panel securely under your chin. Pull the top strap over your head and position it high on the back of the head (3a). Then pull the bottom strap over your head and position it around the neck and below the ears (3b). Adjust for a comfortable fit by pulling top panel toward the bridge of the nose and bottom panel under chin.

4. Place your fingertips from both hands at the top of the metal nosepiece. Using two hands, mold the nose area to the shape of your nose by pushing inward while moving your fingertips down both sides of the nosepiece.

**!** Pinching the nosepiece using one hand may result in improper fit and less effective respirator performance. Use two hands.

**5.** Perform a User Seal Check prior to each wearing. To check the respirator-to-face seal, cover the middle panel with one or both hands. For the 9205+ and 9210+ respirator, inhale and exhale sharply. For the 9211+ respirator, inhale sharply. Be careful not to disturb the position of the respirator. If air leaks around the nose, readjust the nosepiece as described in step 4. If air leaks around respirator edges, adjust panels and straps. **If you CANNOT achieve a proper fit, DO NOT enter the contaminated area. See your supervisor.**

## Removal Instructions
Cup respirator in hand to maintain position on face and pull bottom strap over head. Still holding the respirator in position, pull top strap over head and remove respirator.

## NIOSH Approved: N95
**At least 95% filtration efficiency against solid and liquid aerosols that do not contain oil.**



This respirator contains no components made from natural rubber latex.

**FOR MORE INFORMATION**

**In United States, contact:**
Website: www.3M.com/PPESafety
Technical Assistance: 1-800-243-4630

**For other 3M products:**
1-800-3M-HELPS or 1-651-737-6501

**3M Personal Safety Division**

3M Center, Building 0235-02-W-70

St. Paul, MN 55144-1000

© 3M 2020. All rights reserved.

3M is a trademark of 3M Company, used under
license in Canada

98-0060-0208-7_2

7

# EXHIBIT F

---------- Forwarded message ---------
From: **Disney Health and Safety Team** <Disney.Health.and.Safety.Team@twdc.com>
Date: Tue, Aug 16, 2022, 12:00 PM
Subject: Important Health & Safety Update
To: <GOLDTOYS@gmail.com>

**To: All DPEP Cast Members and Florida-site employees subject to Augmented Health & Safety Protocols**

We wanted to make you aware of an important update to our Company Health & Safety Protocols.

**Effective today, Tuesday, Aug. 16, our Augmented Health and Safety Protocols are being modified across U.S.-based Disney Parks, Experiences, and Products as well as our Florida campuses and offices. As a result, employees and cast members within these segments/campuses who are not verified as fully vaccinated are no longer required to wear a face covering while working indoors or maintain physical distancing (six ft. of distance from others) when not wearing a face covering.**

All employees and cast members, regardless of vaccination status, are encouraged to wear a face covering if they feel more comfortable doing so. There may be select roles (e.g., production) that still require the use of a face covering while indoors.

As a reminder, you can explore the remaining Company Health and Safety Protocols on My Disney Today > Important Information. If you have any questions about this update, please contact your leader or HRBP.

*These protocols are subject to change at any time. Employees represented by a union/Return-to-Work Agreement, please consult your leader to understand what protocols apply to you.*

# EXHIBIT G

**COVID-19 Vaccination Accommodation Request Form**

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to TWDC.GHRO.Leaves.Team@disney.com.

1. If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

   a. Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

   _____
   _____
   _____
   _____

   b. Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

   _____

   c. Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

   The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2. If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

   *Please see attached explanation of my sincerely and deeply held ethical, moral, + religious beliefs.*

   If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

**Verification:**

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment.

Name: Barbara B. Andreas          Date: 8/20/21

Signature: Barbara B. Andreas     Personnel Number (PERNR): 92011991

                                  Phone Number: 908-596-1229

**Barbara B. Andreas**
Guest Experience Manager, ESPN
Prnr 92011991
10353 134th Court, Fellsmere, FL 32948
Barbara.B.Andreas@Disney.com
908-596-1229

To: The Walt Disney World Company HR
Re: Religious Exemption for Covid-19 Vaccinations, Covid-19 Testing, and Face Coverings

I hereby request a religious exemption from any and all Covid-19 vaccinations, Covid-19 testing, and the wearing of a face covering. These are my sincerely and deeply held ethical, moral & religious beliefs.

### Vaccinations
*(Proverbs 6:16-18)* **16** *There are six things the LORD hates, seven that are detestable to him...hands that shed innocent blood,* **18** *a heart that devises wicked schemes...*
*(Psalm 22:10 10) From birth I was cast on you; from my mother's womb you have been my God.*

My religious beliefs condemn abortion. Vaccines contain aborted fetal cells. While the most commonly used cells for vaccines are labeled "MRC5" and "WI38," as many as 80 aborted babies are used in the creation of one vaccine. Some undergoing a cruel "water bag" abortion, to harvest the cells in the freshest manner. Both Pfizer and Moderna used the fetal cell line "HEK 293" in the confirmation phase to ensure the vaccines work. Johnson & Johnson infects "PER.C6" fetal cell lines with adenovirus to create their vaccine.

*(Leviticus 17:11) For the life of the flesh is in the blood: and I have given it to you on the altar to make an atonement for your souls: for it is the blood that maketh an atonement for the soul.*

In the Bible, blood represents the life force of humans. Human blood is to be kept pure under all circumstances and free from contaminants. Vaccine ingredients are considered contaminants from a biblical perspective and contain neurotoxins, hazardous substances, attenuated viruses, animals parts, foreign DNA, carcinogens, and aborted fetal cells.

The Pfizer-BioNTech COVID-19 Vaccine includes the following ingredients: mRNA, lipids ((4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 2 [(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 1,2-Distearoyl-sn-glycero-3- phosphocholine, and cholesterol), potassium chloride, monobasic potassium phosphate, sodium chloride, dibasic sodium phosphate dihydrate, and sucrose.

The Moderna COVID-19 Vaccine contains the following ingredients: messenger ribonucleic acid (mRNA), lipids (SM-102, polyethylene glycol [PEG] 2000 dimyristoyl glycerol [DMG], cholesterol,

and 1,2-distearoyl-sn-glycero-3-phosphocholine [DSPC]), tromethamine, tromethamine hydrochloride, acetic acid, sodium acetate trihydrate, and sucrose.

The Janssen COVID-19 Vaccine includes the following ingredients: recombinant, replication-incompetent adenovirus type 26 expressing the SARS-CoV-2 spike protein, citric acid monohydrate, trisodium citrate dihydrate, ethanol, 2-hydroxypropyl-β-cyclodextrin (HBCD), polysorbate-80, sodium chloride.

*(1 Corinthians 6:19-20) Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies.*

This means we are all made in God's image and need to keep our bodies pure and free from harmful substances and influences. Section 13.1 of every vaccine insert states that the product has never been tested for mutagenic, carcinogenic or fertility impairment. God & family are at the core of our values, and it's against our religious beliefs to inject foreign substances or perform procedures on our bodies with the risk of prohibiting the ability to create life or sustain a healthy life.

*(Jeremiah 30:17) But I will restore you to health and heal your wounds,' declares the LORD.*

In addition, these beliefs also pertain to **Covid-19 testing**. Testing swabs are sterilized with ethylene oxide, a known carcinogen. Even if the possibility is only a trace or miniscule amount, I am not honoring my body as a temple for God by consenting to such procedures or participating in an act to my body that could cause harm.

**Face Coverings**
*(Cor 3:18) And we all, who with unveiled faces contemplate the Lord's glory, are being transformed into his image with ever increasing glory, which comes from the Lord, who is the Spirit.*

*(Gen 2:7) God breathed into his nostrils the breath of life and man became a living soul*

*(Rev 11:11) The breathe of life from God entered them*

*(1 Corinthians 11:7) For a man ought not to have his head covered, since he is the image and glory of God; but the woman is the glory of man.*

*(Matthew 5:48) Therefore you are to be perfect, as your heavenly Father is perfect.*

*(Genesis 1:26-27) Then God said, "Let Us make man in Our image, according to Our likeness.."*

It is my belief that we are made in the image of God and are not to veil our faces. God gave us life, breathing air into our nostrils. We are made in his image and are not to cover or hide our

faces, as it would show shame to our Creator. There are other religions that preach the opposite, covering their heads and faces, and I am not to be mistaken for or engage in the practice of another religion. My religious beliefs prevent the hiding and veiling of my face with a face covering/mask/shield.

**Conclusion**

*Exodus 23:25  Worship the LORD your God, and his blessing will be on your food and water. I will take away sickness from among you..."*

*Exodus 15:26 He said, "If you listen carefully to the LORD your God and do what is right in his eyes, if you pay attention to his commands and keep all his decrees, I will not bring on you any of the diseases I brought on the Egyptians, for I am the LORD, who heals you"*

*Deuteronomy 31:6 Be strong and courageous. Do not be afraid or terrified because of them, for the LORD your God goes with you; He will never leave you nor forsake you."*

*Psalm 46:1 God is our refuge and strength, an ever-present help in trouble.*

It is my sincere belief that my devotion to God, the Bible and it's teachings, will provide myself and my family with the protection and healing it needs. I respectfully request acknowledgement of my religious beliefs and exemption of all vaccine requirements/requests, exemption to testing, and exemption from wearing face coverings.

Barbara B. Andreas                     8/20/21
_____          _____
Barbara B. Andreas                     Date


Jade _____                          8/20/2021
_____          _____
Notary Signature                       Date

Notary Public State of Florida
Jade Zalewski
My Commission GG 340567
Expires 08/02/2023

# EXHIBIT H

| | |
|---|---|
| **From:** | Andreas, Barbara <Barbara.B.Andreas@disney.com> |
| **Sent:** | Friday, August 20, 2021 6:16 PM |
| **To:** | TWDC GHRO Leaves Team |
| **Cc:** | Day, Kelly M |
| **Subject:** | Barbara Andreas- Religious Exemption Request |
| **Attachments:** | Barbara.Andreas.ReligiousAffirmation.pdf;<br>Barbara.Andreas.VaccineAccomodationRequest.pdf |

To The Walt Disney Company HR,

I am writing to request a religious exemption from covering my face with a mask or shield, and to abstain from Covid testing and all Covid vaccines. Though I am not required to explain my religious beliefs, I have attached a document with further details to clarify why this goes against my sincere and deeply held religious beliefs. I have also completed and attached the form you have provided for employees seeking exemptions.

My religious rights and my right to privacy are protected by the U.S. Constitution and the Constitution of the State of Florida.

Religious creed includes my dress and my grooming practices, including what I put on my head or face. Wearing a face covering is an affront of my Christian beliefs.

Further, participating in a medical experiment, such as covid testing or vaccines, is also a violation of my religious beliefs. Covid test and vaccines have an emergency authorization by the FDA, not an approval. Therefore, these are experimental treatments, and I have the right to refuse consent – without being discriminated against, such as being required to stay home or be excluded from other activities.

According to the FDA, https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained:

"FDA must ensure that recipients of the vaccine under an EUA are informed, to the extent practicable given the applicable circumstances, that FDA has authorized the emergency use of the vaccine, of the known and potential benefits and risks, the extent to which such benefits and risks are unknown, that they *have the option to accept or refuse the vaccine,* and of any available alternatives to the product."

The burden of proof to refuse to accommodate my sincerely held religious beliefs is set to a very strict standard. According to law, stereotypes and generalizations are not valid evidence, such as the assumption that I would pose a safety threat to others by not wearing a mask or receiving an experimental vaccine.

No emergency, pandemic, health orders, executive orders, employment or business policies, rules, recommendations, regulations, guidelines, directives, or measures suspend Constitutional rights. No statute of law has been passed by the U.S. Congress that gives an exemption to this facility to allow for my rights to be violated. No president's orders supersede the Constitution.

I have spoken in depth about this situation with my leader, Kelly Day, and have copied her on here as well for transparency.

I look forward to a response and the acknowledgment of my beliefs. Thank you for your time.

Sincerely,

Barbara B. Andreas



ESPNWWOS.com

**Barbara B. Andreas**
**Guest Experience Manager**
Cell: (407) 443-7856
Barbara.B.Andreas@disney.com

**RDO's Monday-Thursday**

# EXHIBIT I

10/13/2021

I'm writing to formally make known a personal concern regarding the process of accomodations for religious exemptions from the Covid 19 vaccines.

 To inform those reading, I am a 20 year cast member, 15 years adjusted, with nearly that entire 15 years being spent in leadership. Throughout my career with Disney, I've been chosen specifically for special assignments (2010 recruiting trip to Germany, Norway and Italy), special teams (2015 Avengers/MyMagic+), special projects (2017-2019 Ticketing Replacement Project/SnApp), opening teams (2015-2016 Shanghai Opening Team/Guest Relations), as well as been a part of the forefront of numerous rollouts such as MDX, Fastpass+, CastApp, turnstiles to touchpoints, etc during the 5 years I spent in MK Guest Relations and Park Entry, 2010-2015. I've received numerous "bonus" merit increases, have consistently achieved "moving ahead" year-end reviews, impeccable attendance, and am confident that all my former direct leadership and peers, would speak incredibly highly on my behalf toward work ethic, teamwork, partnership and overall performance. Not once in my entire career have I been involved in a HR issue or felt the need to make a case, until now.

  As soon as the mandate was announced, I sat with my leader, Kelly Day, at the first opportunity to discuss in depth how I felt about it and my plans to submit a religious exemption. I was met with her full and unconditional support, which was greatly appreciated. I submitted a 3 page, very detailed document in regards to my sincerely and deeply held beliefs against vaccines, testing and mask wearing on 8/20/21 at 6:16pm. On 8/24/21 at 10:55am, I emailed again to include a letter signed by my pastor that was left off the first email. I received a response back from Porcia Wade from Employee Relations to connect and discuss my request. On 8/30/21 at 4pm, this phone call took place.

  Since then, I've heard nothing. We are going on a month and a half, 44 days to be exact, and I'm still awaiting a response. I did my due diligence of submitting what was requested, going above what is actually required to acknowledge religious beliefs, and abided by the deadline set forth by the company as 9/30/21. I received an email on 9/29/21 stated that I would still be considered compliant if the decision process went past the deadline.

   This is a small part of my complaint. I understand these are unprecedented times, and most likely the HR department is overwhelmed with this process. However, for a company that prides itself on diversity, inclusion, and respect, it feels like those are forgotten for those of us exercising our constitutional right to religious freedom, religious practice and privacy.

    In the meantime of awaiting a response, I was continually bombarded via email to complete my attestation. Since I was in the process of a religious accommodation, there was no need for myself to do the attestation. At no point did my leader Kelly ask me personally to complete this or follow up in regards to it. However, I received a zoom meeting request from my GM Mark Dukes for 9/17/21 at 3pm, who told me that my name had shown up on a list for ESPN, as having not done the attestation. This felt like I was being singled out, intimidated, and fear mongered for the fact that even though I'm following the process set forth by the company, I'm being made to look like a delinquent leader failing to complete my duties. I immediately called my leader afterward, who was unaware that this call was even taking place, and expressed my concern with this happening. Kelly has been approachable, supportive, and copied on everything I've submitted throughout this process. So the fact that she didn't know about this call, or that I showed up on the "list", seemingly justifies my feelings of intimidation. While Mark was respectful and professional towards me during the call, it felt very uncomfortable to have this conversation come from my GM and not my direct leader. Especially considering my direct leader Kelly was fully aware of my situation.

     Porcia can attest that during our call, towards the end, I specifically said that I was uncomfortable in my workplace with covering my face. I was very detailed in my written beliefs I submitted, how covering/veiling my face goes against my deeply held religious beliefs. I explained that my situation was unique, being that I had just returned from a 14 month long furlough in mid-June, and shortly after returning, mask requirements had been

lifted so it was never a concern for me. But not much longer after, the company reversed that decision and brought back masking for indoor locations right before the vaccine mandate was announced. I should have written for a religious accommodation to mask wearing immediately upon my return, however since there was no proof of vaccination being required, I didn't feel comfortable singling myself out due to my religious beliefs. With a 20 year career, and not one blemish, I worried about retaliation and did not want to be the one making waves after returning from an incredibly long furlough, to which I was grateful to not have been let go from the company. Further, I asked Porcia specifically if she could possibly expedite the mask exemption, even if the vaccine accommodation took longer. Portia said she would make a note of it for me. Since that call, no one has reached out to me. And I continue to feel uncomfortable, unfaithful, and an affront to my religious beliefs by continuing to cover my face at work. I spend as much time as I can outdoors, including meetings and 1:1's to avoid this sinful (in my belief) practice. Again, a company that prides itself on diversity, inclusion and respect, should be able to timely respond to an inquiry regarding one's religious beliefs. Would it be acceptable to make a Muslim woman wait over 44 days for a request to wear a head covering? Or a Jewish woman wait 44 days for a request to wear a skirt instead of pants as part of her costume? This feels discriminatory and biased.

   Lastly, while my personal phone call with Portia wasn't overly intrusive in nature, this is not what I'm hearing from other cast members. Quite frankly, I'm appalled by the questions they are saying are being asked of them. They are prying, intrusive, and have little to do with that cast members deeply held beliefs. It feels like intimidation to get them to say something that can be used against them or grounds for denial- even though no one from HR when asked can explain what grounds would be used for denial and whether an appeal would be granted. In comparison, I have friends in professional roles with major companies in the state of Florida, who have submitted their religious accommodation forms and were approved the next day! But here I am, day 44, still waiting for acknowledgment. You set forth the deadline of 9/30, yet you are not abiding by it.

   In the meantime, this has and continues to cause undue stress to myself and my family. I am part time now, working weekends mostly, and home with my two young children during the week. It's extremely overwhelming to not know every time I refresh my work emails on my phone whether a response will come through telling me I'm no longer a part of a company I've given TWENTY years of my life to. To constantly be asked by family members and friends if I've heard any news yet. To watch friends in comparable situations receive their accommodations from their companies in a timely manner. To plan for events, staffing, meetings, not knowing if I'll still have a job and able to attend them. To feel in limbo for nearly two months now, three if you include the time from the announcement coming out (conveniently on a Friday at 5pm!). To watch friends, peers, leaders, valued cast, already leave the company over this mandate. And to have to keep all this inside, and put on a happy face to come to work and "make magic" for everyone else, while inside it's weighing down heavily. This is by no means a poor reflection on my direct leader Kelly. She has been supportive of me throughout this process and is always available to talk when needed. But it's also alarming the lack of information she and leaders her level and above are provided. To my knowledge, I'm the only leader at ESPN that is seeking an accommodation. I could be wrong, as I don't make a habit of, or normalize asking someone their personal medical decisions. But from conversations in passing, or openly shared information on their end, I'm quite certain this is true. So on top of stress from the overall situation, there's also the underlying concern for what's yet to come, in regards to personal respect, privacy and retaliation. I do want to be clear that I do not currently feel anything but support from my direct peers. I'm appreciative of such an amazing team whom I work closely with. But team dynamics and work locations can change periodically and I can't say I don't fear what would happen when/if that does occur.

  I kindly ask you to please consider expediting my request and providing acknowledgment of my deeply held, sincere, religious beliefs against vaccinations, testing and mask wearing with the information I submitted back on 8/20/21. And further acknowledge my accommodation to remove myself from the faithless act of veiling my face immediately.

Sincerely,

 Barbara B Andreas

# EXHIBIT J

| | |
|---|---|
| **From:** | Andreas, Barbara <Barbara.B.Andreas@disney.com> |
| **Sent:** | Wednesday, December 29, 2021 3:02 PM |
| **To:** | WADE, PORCIA |
| **Subject:** | Re: Accommodation Request for Barbara Andreas |

Good afternoon Porcia,

Can the company kindly provide how they came to this conclusion? Specifically how my deeply held sincere religious beliefs are being dismissed after extensive written explanations and multiple phone conversations to affirm them.

Thank you,

~Barbara

On Dec 29, 2021, at 12:24 PM, DPEP Restrictions & Accommodation Team <DPEP.Restrictions.Accommodation.Team@disney.com> wrote:

Hello Barbara,

Thank you for taking the time to speak with Employee Relations about your request for a religious exemption from the Company's face cover requirements.

After careful review of the information you provided, we are unable to conclude that you are prevented from wearing a face cover due to a sincerely held religious belief, practice or observance. In addition, based on the essential job functions of your role, we are not able to allow an exemption from the face cover requirements, which have been implemented as a health and safety protocol to promote a safe environment for cast members and guests. As a result, we must deny your request, and if you are unable to follow this health and safety protocol, your employment will be subject to separation.

If you have any questions, please don't hesitate to reach out to the DPEP Accommodations Team at DPEP.Restrictions.Accommodation.Team@disney.com

DPEP Accommodations Team

# EXHIBIT K



1101 E. CUMBERLAND AVE.

SUITE 201H-133

TAMPA, FLORIDA 33602

(813) 279-8491

INFO@SMARTLAWFL.COM

February 14, 2022

The Walt Disney Company
ATTN: Restrictions & Accommodation Team
1375 E Buena Vista Dr.
(321) 939-7013
DPEP.Restrictions.Accommodation.Team@disney.com

RE: Barbara Andreas/Religious objection to COVID-19 employee policies

I have the pleasure of representing Ms. Barbara Andreas, Guest Experience Manager for the Walt Disney Company (hereinafter, "Disney" or "You"), concerning the above-referenced matter. As You know, on or about August 20, 2021, Ms. Andreas notified Disney of an irreconcilable personal conflict with certain employment policies. Specifically, Disney's requirement that employees submit to so-called "vaccination" for the COVID-19 Virus and/or wear face coverings while on duty ("collectively referred to hereinafter as, the "COVID-19 Policies") compels Ms. Andreas to surrender sincerely held religious beliefs and forego attendant practices, as a condition of continued employment. Accordingly, Ms. Andreas requested reasonable accommodation from Disney to alleviate this conflict.

On or about December 29, 2021, after a weeks-long inquiry, Disney's Restrictions and Accommodations Team advised Ms. Andreas that her request for accommodation was denied because, "…we are unable to conclude that you are prevented from wearing a face cover due to a sincerely held religious belief, practice or observance." Respectfully, this response is completely unacceptable and demonstrative of Disney's overall mishandling of this matter, in clear violation of Ms. Andreas's rights under applicable Florida and Federal law.

Under Florida law, Section 381.00317(1), Florida Statutes, provides that, "a private employer may not impose a COVID-19 vaccination mandate…without providing individual exemptions that allow an employee to opt out of such requirement" for five separate reasons, including "religious reasons." Section (2) states that if an employee has submitted an exemption statement under one of the exemptions, "the employer must allow the employee to opt out of the employer's COVID-19 vaccination mandate." Section (4) prohibits an employer from discharging an employee based on a vaccination mandate and termination includes the functional equivalent of a termination. Under rule 2ER21-1(1)(e), the phrase "[f]unctional equivalent of termination" means an employee has "resigned under duress" or the employer "made working conditions so difficult or intolerable that a reasonable person in the employee's position would feel compelled to resign."

Under Federal Law, Title VII of the Civil Rights Act of 1964 prohibits an employer from taking an adverse employment action against any individual…because of such individual's…religion." 42 U.S.C. §2000e– 2(a). The term "religion" is defined as including, "…all aspects of religious **observance and practice, as well as belief**." §2000e(j). Accordingly, "…**an employer may not take an adverse employment action against an applicant or employee because of any aspect of that individual's religious observance or practice** unless the employer demonstrates that it is unable to reasonably accommodate that observance or practice without undue hardship." *Equal Employment Opportunity Commission v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (2015). Discrimination claims under Title VII are divided into two categories: **disparate treatment** (i.e., acts of intentional

discrimination), and **disparate impact** (i.e., acts that indirectly affect members of a protected class). Here, Disney's enforcement of the COVID-19 Policies without regard for its obligation to accommodate the conflicting religious beliefs and practices of its employees is actionable under Title VII as a claim of **disparate treatment discrimination**.

In a recent case which presented analogous facts and issues, the U.S. Supreme Court found an employer liable for disparate treatment discrimination under Title VII in declining to hire a Muslim applicant because of wearing a **religious practice** of wearing a hijab did not fit within the employer's dress policy. *Abercrombie*, at 768. In so doing, the Court held that the law is designed to ensure that "**[a]n employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions**." *Id.* The Court further observed that "Title VII does not demand mere neutrality with regard to religious practices; rather, it **mandates favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual . . . because of such individual's 'religious observance and practice.'**" *Id.* At 775; § 2000e(j); *TWA v. Hardison*, 432 U.S. 63, 66 (1977). "An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious ... practice," it is no response that the subsequent adverse action was due to an otherwise-neutral policy. Simply put, "**Title VII requires otherwise-neutral policies to give way to the need for an accommodation**." *Id.* at 775.

Similarly, here, Ms. Andreas's refusal to participate in an experimental "vaccination" scheme and objection to wearing face a covering are "acts" in accordance with her sincerely held religious beliefs. This is substantively no different than the Muslim applicant's "act" of wearing a hijab, in *Abercrombie*. Accordingly, Disney's enforcement of the COVID-19 Policies here, without affording reasonable accommodation, is prima facie indicia of intentional discrimination under both Title VII. To be clear, this is not a case of disparate *impact* discrimination under Title VII; therefore, Ms. Andreas is under no obligation to engage in a McCarthy-style interrogation or debate about the merits of her beliefs, or to otherwise "prove" the sincerity of same to Disney. And it is unbelievably inappropriate for a Disney agent to unilaterally declare that Ms. Andreas's beliefs are "not sufficiently sincere" to warrant protection or accommodation.

Under Title VII, the burden falls on Disney to justify its discriminatory treatment of Ms. Andreas by demonstrating a compelling purpose for the COVID-19 Policies and undue hardship that would result from affording reasonable accommodation. Disney will doubtless cite an intent to protect the general safety and wellbeing of employees and guests; however, there simply are no clear, irrefutable facts or data to support such general platitudes or to otherwise justify the degree of overreach associated with the COVID-19 Policies. While no reasonable person disputes that common-sense preventative measures, such as routine handwashing and sanitization, are necessary and appropriate efforts to combat the spread of *any* virus, the data now shows that the COVID-19 pandemic is largely an artificial "emergency" that has been imposed and perpetuated by widespread coordinated psychological manipulation of the public through incessant, prolonged, fear-based reporting of inflated death and case counts, culminating in a campaign to coerce the American people to accept the so-called COVID-19 "vaccines," which are untested and unproven biological agents.

In reality, the COVID-19 data presents a very different picture than that painted, collectively, by the media, the pharmaceutical industry, the government, and organizations, like Disney, who prioritize meaningless optics over the wellbeing of its employees. The appearance of a high degree of COVID-19 transmission was created by widespread use of a PCR test, which even its Nobel Prize winning inventor concedes, cannot be used to accurately diagnose the COVID-19 virus. Additionally, the U.S. Department of Health and Human Services "COVID-19 Community Profile Report 20" reveals the following data on the effects of COVID-19 infection, in the United States:
- ER visits: 1.2% due to COVID (26 states <1%, highest is 3.1%)
- Inpatients: 4% due to COVID (considered low)

- ICU patients: 9% due to COVID (considered moderate)
- Total hospitalizations: 46 states ≤ 15 per 100,000 and 49 states ≤ 20
- Cases: 9 per 100,000 per day
- 95% of "COVID-19 deaths" involve an average of 4 comorbidities
- Overall, COVID-19's fatality rate is 0.2% globally, and drops to 0.03% for persons under age 70, which doubtless represents the vast majority of Disney's employee and guest demographic.
- COVID-19's fatality rate is on par with the seasonal flu virus, and substantially lower than that of Tuberculosis (10%), the original SARS (9%), and the MERS virus (30%), all with a comparable rate of spread.

Arguably, to justify enforcement of the COVID-19 Policies (over religious objections) for the ostensible purpose of protecting employees and guests from a virus with an almost statistically non-existent risk of death, and a negligible risk of hospitalization, Disney would need to show that it has taken similarly drastic measures to thwart the spread of other pathogens which present similar, or greater, risks.

Even if Disney *could* demonstrate an essential underlying purpose for the COVID-19 Policies, it would then have to show that the specific measures prescribed thereunder are truly effective mitigation tools, to the exclusion of less-objectionable alternatives. This will be a near impossible undertaking, given the lack of any peer-reviewed data as to the long-term efficacy of any "vaccines" that have been in widespread use for little over a year, to date. Even more problematic, healthcare professionals and reputed Professors of Science and Medicine around the globe have reported catastrophic side effects associated with these hastily produced substances. In fact, many have appealed to the FDA to halt the vaccines, including Canadian Physicians, Israeli People's Committee, Frontline COVID-19 Critical Care Alliance, World Doctors Alliance, Doctors 4 Covid Ethics, and America's Frontline Doctors.

Moreover, both the Pfizer and Moderna EUA COVID-19 experimental injections were only shown to reduce symptoms—not block transmission. In fact, Pfizer employees were recently captured on hidden video admitting that natural immunity obtained through prior infections is more effective than any "vaccine." Indeed, numerous alternative safe and effective treatments for COVID-19 are widely available. Globally and in the United States, treatments such as Ivermectin, Budesonide, and Dexamethasone, convalescent plasma and monoclonal antibodies, Vitamin D, Zinc, and Azithromycin are being used to great effect. While Dr. Anthony Fauci's NIH, which happens to have a financial stake in Moderna's COVID-19 vaccine, and others may downplay these treatments, the fact is that they have been used to great effect and have even resulted in a Nobel Prize nomination. While many of these treatments have been publicly maligned, they are all working in various capacities around the world and are all safer than the "vaccines."

While it is clear that no case can be made to justify mandatory employee "vaccination," it is no "reasonable accommodation" to single out unvaccinated employees for enforcement of mask requirements and other absurd protocols. Indeed, over 400 studies have concluded that restrictive measures, including mask mandates, social distancing and lockdowns have been ineffective at stopping transmission of the virus, and masks themselves have proven harmful to the wearer. Even Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases (NIAID) at the National Institutes of Health (NIH), stated in a 60 Minutes interview on March 8, 2020 that, "…there's no reason to be walking around with a mask…[a]nd often, there are unintended consequences." In a recent study, German researchers found that a mask that covers your nose and mouth poses significant adverse effects and pathophysiological changes, including the following, which often occur in combination: decrease in blood oxygen saturation; increase in heart rate; decrease in cardiopulmonary capacity; feeling of exhaustion; increase in respiratory rate; difficulty breathing and shortness of breath; headache; dizziness; drowsiness; decrease in empathy perception; impaired skin barrier function with acne; itching and skin lesions; and microbiological contamination.

Given the undeniable physical and psychological consequences of prolonged mask wearing—not to

mention the abject cruelty of requiring employees to cover their nose and mouth while engaged in laborious tasks, often under extreme environmental conditions—as well as the absence of any scientifically proven benefit of masks in preventing virus infection and/or transmission generally, Disney's mask requirement is clearly arbitrary and capricious, lacking a plausible nexus to any essential purpose. More significantly, considering the data showing that vaccinated individuals are equally susceptible to Covid-19 infection and transmission, it is readily apparent that the Covid-19 Policies are intended solely to penalize unvaccinated employees and/or discourage a specific religious practice.

In the absence of an objectively compelling purpose for discriminatory employment practices and/or undue hardship that would necessarily result from affording reasonable accommodation to same, an employer must demonstrate a legitimate, non-discriminatory reason for any adverse action taken against an employee. Here, Ms. Andreas has demonstrated a stellar history of employment with Disney dating back to June 2001. Not only has Ms. Andreas never received a formal reprimand or negative feedback relating to job performance, she has earned special recognition for exceptional performance, including merit-based bonuses and salary increases, invitation to participate on special projects, including serving on the opening team for Shanghai Disneyland, and consistently positive feedback on annual reviews. Accordingly, any future adverse action taken against Ms. Andreas by Disney would be presumptively suspect as an act of discrimination.

In light of the foregoing, please be advised that, effective immediately, Ms. Andreas will not comply with the COVID-19 Policies, to the extent that same conflicts with deeply held religious beliefs and practices. Specifically, Ms. Andreas will not submit to a COVID-19 "vaccine" under any circumstances, nor will she wear a mask, face covering, or any other form of so-called "personal protective equipment" during work shifts, unless and until Disney can articulate a compelling and essential purpose that cannot otherwise be satisfied without undue hardship. To that end, we do not accept the generic opinions of "experts" on Disney's payroll, without equal consideration being given to the contrary opinions of unbiased experts and the abundance of conflicting data. Likewise, we reject blind deference to "guidelines" or "protocols" established by unelected government agencies with no lawmaking authority over Disney or its employees. To the extent that any adverse action is taken against Ms. Andreas for her religious beliefs and acts, we will pursue all remedies available under Florida and/or Federal law, in addition to making the public aware of Disney's profound mistreatment of its employees, to the greatest degree possible and allowable under law.

In closing, kindly direct any future questions or concerns to my attention and refrain from independently engaging my client regarding this matter without my advance knowledge and consent.

Warm Regards,

Carroll G. Sanders, Esq.
Carroll@Smartlawfl.com

Cc:    Porcia.Wade@disney.com
       Faron.Kelley@disney.com
       Kelly.M.Day@disney.com
       Barbara.B.Andreas@disney.com

EXHIBIT L

**COVID-19 Vaccination Exception Request Form**

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to TWDC.GHRO.Leaves.Team@disney.com.

1. If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

a. Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

_____
_____
_____
_____

b. Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

c. Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2. If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

As a devout and practicing Christian, I have strong religious convictions against abortion. This belief stems from Psalm 139:13 "For you created my inmost being, you knit me together in my mother's womb." For me this verse demonstrates the sanctity of life even in very beginning stages. According to health.com, nebraskamed.com, and several maintstream medical sites the Johnson and Johnson vaccine, the Jansen vaccine as well we the Moderna and Pfizer vaccine have all used cells from a terminated fetus, either in testing or developmental stages of the vaccine, I cannot in good conscious and still aligning with my faith accept this vaccine into my person. To that end, for all the products that I knowingly use in my daily life—particularly products I put on my skin and in my body—I have conducted research to confirm that they do not violate my convictions.  Certainly, in the context of the afore-mentioned COVID-19 vaccines, I do not believe that using cells from an aborted fetus for the benefit of the greater good or my personal benefit can be reconciled with my religious beliefs.

Further, 1 Corinthians 6:19-20 says:  'your body is a temple of the holy spirit. You must honor God with your body." Accordingly, I am extremely cautious about putting anything into my body—I have never consumed tobacco or illicit drugs, and I have abstained from sexual intercourse for my entire life (awaiting marriage). Likewise, I cannot in following the application of this verse inject a manmade substance into my body that has not been tested effectively on animals, or undergone long term observation vis-a-vis human consumption.

If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

**<u>Verification</u>**:

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment.

Name: Stephen Joseph Cribb                      Date: 8/20/2021
Signature: _Stephen Cribb_                      Personnel Number (PERNR): 00625583

# EXHIBIT M

Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

---

**From:** Carroll Sanders
**Sent:** Tuesday, April 5, 2022 6:26 PM
**To:** Suzuki, Jennifer
**Subject:** RE: REQUEST: Phone Conversation with Employee Relations

Hi, Jennifer. Respectfully, I have advised you multiple times that I represent Mr. Cribb concerning this matter, and I have kindly requested that all communications regarding same be directed to me. Nonetheless, Ms. Wade continues to reach out to Mr. Cribb directly by phone and email. I would point out that under the comments to Florida Rule of Professional Conduct Rule 4-4.2 (i.e., the "no contact rule"), "[a] lawyer may not make a communication prohibited by this rule through the acts of another. See 8.4(a)." In other words, the rule does not cease to apply to Disney because a non-attorney is the one making the direct contact with a known represented party. To that end, my only communication to Ms. Wade—an email on which you were copied—asked that she kindly discontinue such inappropriate efforts. I do not believe this is the type of communication contemplated by Rule 4-4.2; however, I will certainly respect your request going forward, provided that Disney shows my client and I the same courtesy.

As for Disney's desire to engage Mr. Cribb privately, I cannot agree to that. Disney has not acted in good faith throughout this matter (and others), so we simply cannot trust a Disney agent to be fair to Mr. Cribb in an environment in which he does not have a witness present. Moreover, contrary to your factual assertions below, Mr. Cribb absolutely conveyed his concerns and objections to Disney's "safety protocols" (including mask requirements) to his direct supervisor, his general manager, the vice president of resort operations, and others on multiple occasions. Nevertheless, Disney showed no interest in having a meaningful conversation with Mr. Cribb at any point over the last eight months, and it certainly took no serious action to reconcile his objections. If Disney wants to continue its COVID-19 charade, it is free to do so. But recent USSC case law makes it perfectly clear that such a policy must yield whenever it creates conflict with an employee's faith, period. Instead, here, Disney chose to punish an otherwise model employee for doing nothing more than acting in accordance with his deeply help religious beliefs.

As I have offered before, I am happy to arrange a meeting with Mr. Cribb to discuss this matter further with you or a designated agent of Disney. Alternatively, I will be happy to speak on Mr.

Cribb's behalf as to the specifics of his position, subject to applicable privileges.

Best,

Carroll Sanders, Esq.

1101 E Cumberland Ave.

Suite 201H-133
Tampa, Florida 33602

(813) 279-8491



**NOTICE OF CONFIDENTIALITY**: This email, and any attachments thereto, is intended for use only by the addressee(s) named herein and may contain confidential information, legally privileged information and attorney-client work product. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you have received this email in error, please notify the sender by email, telephone or fax, and permanently delete the original and any of any email and printout thereof. Thank you.

**IRS CIRCULAR 230 NOTICE**: In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for (a) the purpose of avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

---

**From:** Suzuki, Jennifer
**Sent:** Tuesday, April 5, 2022 3:56 PM
**To:** Carroll Sanders
**Subject:** RE: REQUEST: Phone Conversation with Employee Relations

Hi Carroll. Consistent with professional rules on lawyers' communications with represented parties (including organizations), I ask again that you direct your communications about this matter to me.

In August 2021, Mr. Cribb made an accommodation request related to the vaccine requirement that was in effect at the time.  Subsequently, after the passage of Florida Statute § 381.00317, the company paused enforcement of the vaccine requirement and this was communicated to Mr. Cribb on November 19, 2021.  At that time, Mr. Cribb was also informed that any accommodation requests related to the vaccine requirement would not be evaluated, given that vaccination was not a condition of employment.

We do not have a record of Mr. Cribb having made any accommodation request related to other safety protocols, including the face cover requirement.  If Mr. Cribb has such an accommodation request, the process is for Employee Relations to have a conversation with him, one on one.  Of course Mr. Cribb is entitled to consult with his attorney on this or any other matter, but any discussion with Employee Relations about a current employee's accommodation need is meant to be a direct dialogue, without attorney participation in the meeting.  Without this direct dialogue, the company will not be able to review his request.  I would ask that you encourage Mr. Cribb to contact Porcia so she has an opportunity to talk to him about his request, as well as any other concerns he may want to share.

Thank you,

Jennifer

---

**From:** Carroll Sanders <carroll@smartlawfl.com>
**Sent:** Wednesday, March 30, 2022 8:24 AM
**To:** Stephen Cribb <sjcribb86@gmail.com>; WADE, PORCIA <PORCIA.WADE@disney.com>
**Cc:** Suzuki, Jennifer <Jennifer.Suzuki@disney.com>
**Subject:** RE: REQUEST: Phone Conversation with Employee Relations

Hi, Porcia—me again. I have made it abundantly clear to you and to Ms. Suzuki that I am representing Mr. Cribb concerning Disney's discriminatory policies and the adverse employment action that it took against Mr. Cribb for asserting his lawfully protected religious beliefs/acts. I have initiated claims with the EEOC, the Florida Commission on Human Relations, and the Florida Attorney General on Mr. Cribb's behalf; therefore, he will not be speaking directly with you or anyone from Disney unless I am present. Frankly, until Disney is prepared to issue a formal

apology to Mr. Cribb for it's utterly intolerable actions, and reinstate his employment without qualification, and issue backpay for the entirety of his unjust suspension, and abandon its discriminatory employee policies going forward—as Disney has already done for all guests, regardless of vaccination status—there really is not much to discuss here.


Best,


Carroll Sanders, Esq.

1101 E Cumberland Ave.

Suite 201H-133
Tampa, Florida 33602

(813) 279-8491



**NOTICE OF CONFIDENTIALITY**: This email, and any attachments thereto, is intended for use only by the addressee(s) named herein and may contain confidential information, legally privileged information and attorney-client work product. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you have received this email in error, please notify the sender by email, telephone or fax, and permanently delete the original and any of any email and printout thereof. Thank you.

**IRS CIRCULAR 230 NOTICE**: In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for (a) the purpose of avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

---

**From:** Stephen Cribb <sjcribb86@gmail.com>
**Sent:** Wednesday, March 30, 2022 11:04:19 AM
**To:** Carroll Sanders <carroll@smartlawfl.com>
**Subject:** Fwd: REQUEST: Phone Conversation with Employee Relations

---------- Forwarded message ---------
From: **WADE, PORCIA** <PORCIA.WADE@disney.com>
Date: Wed, Mar 30, 2022 at 11:00 AM
Subject: REQUEST: Phone Conversation with Employee Relations
To: sjcribb86@gmail.com <sjcribb86@gmail.com>


Hi Stephen,


As you know, you were suspended on March 16, 2022 for refusing to wear a face covering, as required by applicable health and safety protocols.  On March 18, I called you and let you know I would like to have a conversation with you to understand more about what happened.  You said you did not want to speak with me without your lawyer (who was there with you when I called), or without recording our conversation.  I said I would reconnect with you at a later time.


Since our call on the 18th, I have learned you may have an accommodation need concerning the safety protocols.  I tried reaching you and left voicemails for you this past Monday and Tuesday. Please call me at your earliest convenience so I can learn more about your request and about the events leading to your suspension.  For clarity, the conversation will be one on one between you and me, and recording will not be permitted.


Stephen, I know you have concerns on your mind, and I would really like to talk to you directly to understand them better.


Thank you.


**Porcia Wade |** Employee Relations **|** Disney Parks, Experiences, and Products

**Office:** 407.828.4557 (8-222) **| Cell:** 407.701.8339    **| Days off:** Sat. & Sun.

# EXHIBIT N



*Are you requesting a medical or religious accommodation?

Religious

*If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

Unfortunately, there is a slue of reasons not to take this experimental vaccine. (https://www.fda.gov/media/150386/download ,page 13 paragraph Y). The safety of the use of an MRNA vaccine that has never been used on humans and stopped on animals after they kept dying looks like a myriad of reasons not to support an experimental medical procedure. These vaccines have had the highest death toll and adverse reactions than any other vaccine released to the public to date. As those numbers are suppressed by censorship and not reporting to VERS. It is believed long ago that we are nearing heard immunity (https://pubmed.ncbi.nlm.nih.gov/33933145/)

As a Christian, it is hard to ignore the truth of the plandemic. Me writing this very letter out to me is more that proof that dying of Covid19 is not a life changing event. Thank God. If it was not for Media, Big Tech censorship, and corporate companies like you. We not know Covid19 even exist. I know of no one who has died. However, some have been sick. Not uncommon for any year. Those who do not seek truth will never see it.

I believe, trusting in "science" has never gotten me anywhere and will get many people sick or killed with an experimental potion.
I believe, "And ye shall know the truth, and the truth shall make you free,"(John, 8:32).
I believe, the truth is through God the Father and his Son Jesus "I am the way and the truth and the life. No one comes to the Father except through me. (John 14,6).
I believe, and have faith that, Jesus said to her, "I am the resurrection and the life. Whoever believes in Me will live, even though he dies, (John, 11:25).

I also believe, "Do you not know that you are God's temple and that God's Spirit dwells in you? If anyone destroys God's temple, God will destroy him. For God's temple is holy, and you are that temple,"(1 corinthians 3:16-17). We are that temple and should not knowing truth do harm to our self. Just as stated in, ecclesiastes 7:17, "Be not overly wicked, neither be a fool. Why should you die before your time?"

Suicide is an abomination to our body, to the spirit of man, and only Lucifer the devil himself would profit from the mass killing, sterilization, crippling effects of an experimental vaccine. Our bodies were not made by God to put a known poison into it.

No one truly knows what awaits us but as my beliefs stand with truth, not science, will save us from a plandemic created by men. God with his Son Jesus will save us.

If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

*☑ I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment.

Attach Document



# EXHIBIT O



DATE

**Request for Religious Exemption**

To Whom It May Concern:

 Steven  is affiliated with our church, Faith Assembly of God of Orlando, which has been in existence since 1975. Our position concerning vaccinations, as directed by the senior pastor, is for every individual to make it a matter of personal prayer; each individual is to decide whether to get the vaccine or not as they believe God speaks to them.

Our federal laws allow for personal religious beliefs.  Steven  is exercising their rights under the Title VII of the Federal Civil Rights Law of 1964, section 12, to receive religious exemption to immunizations due to their genuine and sincere religious beliefs.

We request that you honor this religious exemption for   Steven  Gibbons.

Sincerely,

*Pastor Carl Stephens*

Pastor Carl Stephens
Senior Pastor

**Curry Ford Campus**
9307 Curry Ford Road
Orlando, FL 32825

**Michigan Street Campus**
2740 E. Michigan Street
Orlando, FL 32806

Carl Stephens, Senior Pastor  |  407.275.8790  |  www.faithassembly.org

## Fw: Updated response including case numbers and email

From: Steve Gibbons (rav1112g@yahoo.com)

To: dpep.restrictions.accomodation.team@disney.com

Date: Monday, December 20, 2021 at 11:04 AM EST

----- Forwarded Message -----
**From:** Steve Gibbons <rav1112g@yahoo.com>
**To:** dpep.restrictions.accomidation.team@disney.com <dpep.restrictions.accomidation.team@disney.com>
**Sent:** Sunday, December 19, 2021, 11:37:10 AM EST
**Subject:** Fw: Updated response including case numbers and email

----- Forwarded Message -----
**From:** Steve Gibbons <rav1112g@yahoo.com>
**To:** Collazo346.com <Collazo346@gmail.com>
**Sent:** Friday, December 17, 2021, 05:20:36 PM EST
**Subject:** Fw: Updated response including case numbers and email

Sent from Yahoo Mail on Android

----- Forwarded Message -----
**From:** "Steve Gibbons" <rav1112g@yahoo.com>
**To:** "Steve Gibbons" <steven.gibbons@disney.com>
**Sent:** Fri, Dec 17, 2021 at 5:08 PM
**Subject:** Fw: Updated response including case numbers and email

Sent from Yahoo Mail on Android

----- Forwarded Message -----
**From:** "Steve Gibbons" <rav1112g@yahoo.com>
**To:** "#WDW Data Comm Foremen" <wdw.dl-data.comm.foremen@disney.com>,
"DPEP.Restrictions.Accomodation.Team@disney.com"
<DPEP.Restrictuions.Accomodation.Team@disney.com>, "David B. Araujo Jr"
<david.b.araujo.jr@disney.com>, "Kevin Ciullo" <kevin.ciullo@disney.com>, "Ryan B. Freeman"
<ryan.b.freeman@disney.com>
**Sent:** Fri, Dec 17, 2021 at 4:38 PM
**Subject:** Updated response including case numbers and email
All,

I was approached this week and pulled into a Manger's office. Then asked outright if I was vaccinated. When I responded "I'm not sure I'm am supposed to answer that question" I was then told that since I had not submitted documents to the verify website the company is now assuming I am no longer in compliance with the vaccine policy. Then I told I would be required to wear an n-95 mask and goggles to cover my eyes at all times on property. I was also informed by a foreman that we have also been instructed not to remove the mask to drink unless we go to a break room, and that we are not permitted to eat in the break room if another cast member is present. My union rep was called and arrived I

followed the union reps guidance at that time. I have since been in contact with hr and am including the
hr case number, and the Email from global hr that I received back in October that states that I have an
open case and I am considered in compliance of the policy while the case is open. I contacted global hr
and spoke with Michelle who confirmed that yes I do have an open case (I provided the case number
below), and am still considered in compliance with the policy and should be following the policy the
same as any other in compliance cast member. She reassured me that no one should have ever told me
the I would be suspended or fired. She also stated that there has been no change since the October
email was sent to me. She also wanted me to share that if any of the managers had questions about this
that they should contact hr and reference the case numbers below.

Todays  case number 3065251

Open case number for exemption is 2910537

Sent from Yahoo Mail on Android

> ----- Forwarded Message -----
> **From:** "TWDC Global HR Operations Services" <TWDC.GHRO.Services@twdc.com>
> **To:** "RAV1112G@YAHOO.COM" <RAV1112G@YAHOO.COM>
> **Sent:** Fri, Oct 29, 2021 at 2:34 PM
> **Subject:** Your Vaccine Accommodation Request

Dear Employee,

Our records show that your accommodation request is currently in the review process, and
we wanted to provide an update.  We want to make sure to conduct a thorough review, and
please be assured that while your request is being reviewed, you will not be considered to be
out of compliance with the Company's vaccine requirement.

Employees with pending accommodation requests should continue working, following the
applicable health and safety protocols for their location and position.

If Employee Relations has already contacted you regarding the completion of this review,
please disregard this message.  Otherwise Employee Relations will be in touch with you
about your request.

Thanks,
Disney Global Human Resources Operations

# EXHIBIT P

## COVID-19 Vaccination Exception Request Form

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to TWDC.GHRO.Leaves.Team@disney.com.

1.  If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

    a.  Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    Severe allergies (anaphalxis) and severe reactions to medications and recent vaccines. My side effects range from mild to severe, getting worse over the past several years. These include severe headaches, debillitating body aches, fevers, and anaphalxis (can't breathe)

    b.  Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

    Permanent

    c.  Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2.  If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

    If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

## Verification:

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment.

Name: Cheron Hayes                                Date: 8/10/21

Signature: _[signature]_                          Personnel Number (PERNR): 00350271

## Letter by Mary H Quarterman, MD on 8/17/2021



**Physician Associates**
*Member of Orlando Health Medical Group*

ORLANDO HEALTH PHYSICIAN ASSOCIATES - FAMILY MEDICINE
7243 DELLA DR STE K
ORLANDO FL 32819-5106
407-381-7366

August 17, 2021

Cheron M Hayes
9858 Namaste Loop
Apt 3411
Orlando FL 32836-5542

To Whom It May Concern:
Due to prior adverse reactions to shingles and flu vaccination, Cheron Hayes has decided the benefit of the COVID 19 vaccination does not outweigh the risk of her own possible adverse reaction. Please contact my office with any questions or concerns.

Thank you,

Mary Quarterman, M.D.

Orlando Health
Physician Associates
Mary Quarterman, MD
7243 Della Drive, Suite K
Orlando, FL 32819
Tel 407.370.8705
Fax 407.370.8732

## Chart Review Routing History

No routing history on file.

# EXHIBIT Q

## COVID-19 Vaccination Accommodation Request Form

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to _____.

1. If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

   a. Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

   Severe allergies (anaphalaxis) and severe reactions to medication and recent vaccines. My side effects range from mild to severe, getting worse over the past several years. These include sever headaches, debilitating body aches fevers, and anaphalxis. Although both doctors i have seen will not "officially" exempt me from the vaccine, they both have said that i would need to be in the hospital to receive it, given my severe reactions.

   b. Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

   Permanent

   c. Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

   The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2. If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

   If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

**Verification**:

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment and/or withdrawal of my offer of employment.

Name: Cheron Hayes                          Date: 2/18/22

Signature: _____          Personnel Number (PERNR): 00350271

Contact Phone: 407-982-0560                 Work Location: _____



5900 Turkey Lake Road, Suite A, Orlando, FL 32819
Ph: (407) 351-9696    |    Fax: (407) 351-8848

Date: 09/21/2021

Re: CHERON HAYES
DOB: 03/22/1967

Cheron Hayes is under my care at Harris Internal Medicine. Patient has a history of severe allergic reaction to the influenza and shingles vaccine. We have discussed that despite this, the COVID vaccine is still highly recommended. While I cannot exempt Ms. Hayes from the COVID vaccine, it would be reasonable to allow patient to work from home exclusively and/or get tested for COVID weekly. Please call 407-351-9696 for any questions.

Sincerely,

Harris Internal Medicine

Current
doctor
@ 2/18/22

Harris Internal Medicine
Thomas D. Harris, M.D.
5500 Turkey Lake Road, Ste. A
Orlando, FL 32819
(407) 351-9696

## Letter by Mary H Quarterman, MD on 8/17/2021



ORLANDO HEALTH PHYSICIAN ASSOCIATES - FAMILY MEDICINE
7243 DELLA DR STE K
ORLANDO FL 32819-5106
407-381-7366

August 17, 2021

Cheron M Hayes
9858 Namaste Loop
Apt 3411
Orlando FL 32836-5542

To Whom It May Concern:
Due to prior adverse reactions to shingles and flu vaccination, Cheron Hayes has decided the benefit of the COVID 19 vaccination does not outweigh the risk of her own possible adverse reaction. Please contact my office with any questions or concerns.

Thank you,

Mary Quarterman, M.D.

Orlando Health
Physician Associates
Mary Quarterman, MD
7243 Della Drive, Suite K
Orlando, FL 32819
Tel 407.370.8705
Fax 407.370.8732

## Chart Review Routing History

No routing history on file.

cheronhayes@yahoo.com

**From:**     cheronhayes@yahoo.com
**Sent:**     Monday, January 31, 2022 5:24 PM
**To:**       'TWDC GHRO Services'
**Cc:**       'TWDC GHRO Leaves Team'; 'DPEP.Restrictions.Accomodation.team@disney.com'; 'Giacalone, Margaret C';
              'CScott@ScottWagnerLaw.com'; 'Jihane.Elizee@disney.com'; 'jonathan.ylaya@disney.com'
**Subject:**  RE: Legal Matter; Cheron Hayes (Rehire Status)

Global HR Team,

I have successfully interviewed for a position with the Retail Accounting Team (position # 905299BR, Senior Financial Accounting Analyst), and today was offered the position by the recruiter (Jonathan Ylaya). He was walking me through the onboarding process, and he informed me of the vaccine mandate. I told him about our email communication, and that I had already requested the accommodation afforded by the Florida law.

He said he would be reaching out to you, but I wanted to send this email so that the process of me coming back to work would not be delayed.

Thanks so much in advance for your consideration in this matter.

Thanks!!

Cheron Hayes

**From:** TWDC GHRO Services <TWDC.GHRO.Services@disney.com>
**Sent:** Friday, January 21, 2022 7:37 PM
**To:** 'cheronhayes@yahoo.com' <cheronhayes@yahoo.com>
**Cc:** TWDC GHRO Services <TWDC.GHRO.Services@disney.com>; TWDC GHRO Leaves Team <TWDC.GHRO.Leaves.Team@disney.com>;
'DPEP.Restrictions.Accomodation.team@disney.com' <DPEP.Restrictions.Accomodation.team@disney.com>; 'Jihane.Elizee@disney.com'
<jihane.Elizee@disney.com>; Giacalone, Margaret C <Margaret.C.Giacalone@disney.com>; 'CScott@ScottWagnerLaw.com' <CScott@ScottWagnerLaw.com>
**Subject:** RE: Legal Matter; Cheron Hayes (Rehire Status)

Hello Cheron,

Thank you for reaching out. Someone will be in touch with you soon.

Thank you,

1

Global HR Operations

**From:** cheronhayes@yahoo.com <cheronhayes@yahoo.com>
**Sent:** Friday, January 14, 2022 11:53 AM
**To:** TWDC GHRO Leaves Team <TWDC.GHRO.Leaves.Team@disney.com>; 'TWDC Global HR Operations Services' <TWDC.GHRO.Services@twdc.com>; DPEP.Restrictions.Accomodation.team@disney.com; jinhane.Elizee@disney.com; Giacalone, Margaret C <Margaret.C.Giacalone@disney.com>
**Cc:** CScott@ScottWagnerLaw.com
**Subject:** Legal Matter; Cheron Hayes (Rehire Status)
**Importance:** High

Letter to Human Resources: Re Legal Matter

Team,

As you know I was separated from Disney due to my status as non-vaccinated. Since that time, I have applied for numerous remote and telework positions (both inside and outside of Disney) to no avail. My prior position at Disney was filled. I have been applying for several Disney positions (sometimes several a day), and I don't understand why I am not getting rehired. I was employed over 14 years and have no negative employment history. I am on a re-hire status but there seems to be a force working against me.

I have also learned that under Fla. Stat. Section 381.00317(3) I should be considered for an accommodation that includes wearing a mask and PPE. I would like to be considered for this accommodation. I have reached out to human resources and the recruiter for a position that I received a call on (Alissa Lloyd) and have not received a response.

I am not looking to make a claim, as I'd rather have my job and continue my employment with Disney. Can you please direct me to someone who can help?

Sincerely,

Cheron Hayes
cheronhayes@yahoo.com
(407) 982-0560
PERNR 350271

2

## COVID-19 Vaccination Exception Request Form

*Previously Submitted (not full)*

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to TWDC.GHRO.Leaves.Team@disney.com.

1.  If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

    a.  Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    Severe allergies (anaphalxis) and severe reactions to medications and recent vaccines. My side effects range from mild to severe, getting worse over the past several years. These include severe headaches, debillitating body aches, fevers, and anaphalxis (can't breathe)

    b.  Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

    Permanent

    c.  Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2.  If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

    If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

**Verification**:

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment.

Name: Cheron Hayes                          Date: 8/10/21

Signature: *[signature]*                     Personnel Number (PERNR): 00350271

## COVID-19 Vaccination Accommodation Request Form

If you are requesting an exception to the Company's mandatory vaccination policy due to your (1) disability or medical condition, or (2) sincerely held religious belief, practice or observance, please complete this form and submit it to _____.

1. If you are unable to receive a COVID-19 vaccination due to a disability or medical condition:

    a. Please explain the nature of the limitations resulting from your disability or medical condition and how they prevent you from receiving a COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    b. Is your limitation that prevents you from receiving the COVID-19 vaccination permanent or temporary? If temporary, when will you be able to receive the COVID-19 vaccination?

    _____

    c. Please attach documentation from your medical provider confirming the existence of a disability or medical condition, the duration and resulting limitations, and providing information about how those limitations prevent you from receiving the COVID-19 vaccination. (Please do not disclose the underlying condition or any genetic information.)

    The Company may ask to discuss your request with your doctor if the documentation provided is not sufficient to evaluate your accommodation request.

2. If you are unable to receive a COVID-19 vaccination due to a sincerely held religious belief, practice or observance, please explain the nature of your religious belief, practice or observance and how it prevents you from receiving a COVID-19 vaccination.

My sincerely held religious beliefs do not allow me to receive the COVID-19 vaccine, since, the vaccines are createde cusing aborted fetal cells. "For you created my innermost being. You knit me together in my mother's womb." Psalm 139:13. I will not knowingly participate in the process to use such a product that violates the right to life and dishonors the lives of the unborn. I cannot receive a Covid vaccine under any circumstances.

    If necessary to evaluate your accommodation request, the Company may ask to discuss the nature of your religious belief, practice or observance and accommodation request with your religion's spiritual leader (if applicable) or another third party who is aware of your religious belief, practice, or observance.

### Verification:

I verify that the above information is true and accurate and I understand that any misrepresentation may result in disciplinary action, including termination of employment and/or withdrawal of my offer of employment.

Name: Cheron Hayes                          Date: 2/25/22

Signature: _____                Personnel Number (PERNR): 00350271

Contact Phone: 407-982-0560                 Work Location: _____



## RELIGIOUS EXEMPTION FROM COVID-19 VACCINATION

| Employee Name | Date of Birth | Phone Number |
|---|---|---|
| Cheron Hays | 3/22/67 | 407 982-0360 |
| Employer Name | | Date of Request |
| The Walt Disey Company | | 2/25/22 |

**Exemption Statement**

Pursuant to section 381.00317, Florida Statutes:

I hereby declare that I decline the COVID-19 vaccination because of a sincerely held religious belief, which may include a sincerely held moral or ethical belief.

_Cheron M. Hays_

**Employee Signature**

_Cheron Hayes_

**Employee Name (print)**

Date 2/25/22

**NOTE: An employer shall not inquire into the veracity of the employee's religious beliefs. Pursuant to section 381.00317(2), Florida Statutes, this completed exemption statement requires the employer to allow the employee to opt-out of the employer's COVID-19 vaccination mandate.**

DH8017-DCHP-11/2021
Emergency Rule 64DER21-17

# EXHIBIT R

| | |
|---|---|
| **From:** | Koepke, Cathryn <Cathryn.Koepke@disney.com> |
| **Sent:** | Thursday, January 27, 2022 3:24 PM |
| **To:** | Cathy Koepke |
| **Subject:** | FW: Cathy Vaccination Accommodation Request |

---

**From:** Koepke, Cathryn
**Sent:** Tuesday, January 11, 2022 5:16 AM
**To:** Freedman, Debra <Debra.Freedman@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Debra,

I did meet with the allergist on Friday and she did state that I have an autoimmune disorder and could be at risk in taking the vaccine but unfortunately she would not write me an exemption letter because my health conditions do not fall under the guidelines of the CDC. Dr. Lisa Sullivan could not guarantee me that I will not have an allergic reaction nor would they accommodate me if something were to happen to me but she will not write me an exemption letter. I do have all the test results and can show you that I have markers to potential autoimmune disorder that the vaccine might trigger but not enough that the allergist will exempt me from taking the vaccine.

As I stated to you in my original meeting I will not get the vaccine due to the adverse reactions that I had taking a flu vaccine three years ago that put me in the hospital. I have had COVID twice and never have been hospitalized when I contracted COVID. In 2019 I had a severe case of COVID but was never hospitalized and my immunity system was able to fight it off naturally. I also contracted COVID in early December of 2021. I had a minor symptoms of running nose and a mild headache. That was all. I quarantined during that time and did not infect any others around me.

The Cleveland Clinic and Harvard Medicine have come out with excellent studies that indicate natural immunization is far better than the vaccine. Israel has also conducted studies and have found that individuals who have not been vaccinated but have gotten COVID have been able to fight off the virus better than those that are vaccinated. You are seeing that even those who are fully vaccinated are still getting the virus. The whole purpose of the virus is to minimize and cut down on hospitalizations. As I have stated, I have had COVID twice and neither time was hospitalized. I was able to fight off the infection with vitamins, exercise and eating healthy.

I do want you both to know that I love my job and working for Disney and I am willing to do whatever you need for me to keep Disney employees safe. I currently work remote out of my IL office and never go into a Disney office. If I ever did need to attend an meeting I would be willing to take PCR tests and or Antigen tests and wear a mask all day.

I am deathly afraid to take the vaccines because of my adverse reaction that I had three years ago taken the flu shot. At this point no doctor can guarantee me that I will not have another severe reaction to any of the vaccines. None of the pharmaceutical companies bear no liability for injuries or deaths resulting from their products. The covid-vaccine makers are allowed to create a one-size-fits all product, with no testing on sub-populations (i.e. people with specific health conditions) and yet they are unwilling to accept any responsibility for any adverse events or deaths their products cause. I will not take a vaccine that is still in an experimental phase and not approved by the FDA. All the vaccines are still in the experimental phase even though they have supposedly passed the safety standards. We are also seeing that the vaccines do not "stop" transmission or the infection. There are just as many if not more individuals who are vaccinated that are still getting COVID. The vaccines can't stop us from spreading the virus; it can't stop the virus from

1

infecting us once we have it; and to get the vaccine is to accept the risk of these experimental products and the best the vaccine might do is lower symptoms. I can sight statistics of the number of cases where people are getting vaccinated and still getting COVID and some with severe symptoms. I can honestly say that I have never been vaccinated, have gotten COVID but still able to fight off the infection with minor symptoms. My natural immunities recognize the virus and they know how to fight it.

The other question I have is why are we requiring people to get vaccinated when the CDC states that COVID at a 99.7% survival rate. Why would I take a risk on a product that doesn't stop infection or transmission, to help me overcome a cold that has a .26% chance of killing me. I have a higher chance based on past experience of having an adverse reaction and becoming ill from the vaccine.

I did state in my appeal that I will take the vaccine if Disney will compensate me and or my family if I were to have any adverse reactions to the vaccine or die from taking the vaccine. Not one of the doctors that I have gone to can guarantee that I will not have an adverse reaction to the vaccine. All they can say is that I do not have a medical condition stated by the CDC to warrant an health exemption.

As I stated in my original appeal I am a widow and lost my husband tragically in a car accident three years ago. I do not want to get vaccinated and have a severe reaction only to leave my children without parents. It is my constitutional right as a citizen of the United States to decide on what is best for me and my health. As it stands now I have had COVID twice and have survived it without ever entering a hospital. I have a strong immune system that does not require me taking an experimental vaccine. I am not an anti-vaxer and have taken vaccines in the past. I chose not to take this vaccine because it is still in its experimental phase and there is a lot of very good evidence that natural immunity is just as good if not better than the vaccine. I have natural immunity because I have had COVID twice and have successfully fought off the infection twice without ever entering the hospital.

I also chose not to take this vaccine because it is against my religious beliefs. I have filed two appeals. A religious appeal and the health appeal. I would still like to exercise my rights that this vaccine goes against my religious beliefs because I do not believe in using human fetuses for testing or otherwise. I am pro-life and have been my whole life. I do not believe in abortion and I go to a religious natural health food store where I purchase all my vitamins that have no fetuses used in the products or during the testing phase.

I ask you to please accept my appeal and please allow me to continue to work at Disney. I love my job and I do a good job for the company. I am a widow who has no other means to take care of myself. I have gone through so much in my life in dealing with the tragic loss of my husband that to lose a job I love because of a vaccine would be tragic. I love my children and I don't want to leave them without having parents. I am very afraid based on past experience that could very easily happen.

As I have stated in my prior appeal, if Disney will sign a document stating they will cover damages due to any adverse reactions that I experience then I will consider taking the vaccine.

In closing I do have the extensive reports and testing that was completed by the allergist if you would like for me to send. The allergist is going to follow-up with me in 3-4 months to run more tests on my immunity system seeing they did see I have issues.

Please let me know what my options are at this point in time.

Best wishes,

Cathryn Koepke

---

**From:** Freedman, Debra <Debra.Freedman@disney.com>
**Sent:** Monday, January 10, 2022 2:01 PM

**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Cathryn,

I'm following up with you after your appointment on Friday.  Do you have a note to submit for your request for an accommodation?

Happy new year,
Debra

*Debra Freedman*
Phone:  818 726-9725

---

**From:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Sent:** Wednesday, December 29, 2021 12:51 PM
**To:** Freedman, Debra <Debra.Freedman@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

That sounds good Debra.  In the meantime I hope you have a wonderful New Years.

Thank you for your follow-up and your help during this process.

Best,

Cathryn Koepke

---

**From:** Freedman, Debra <Debra.Freedman@disney.com>
**Sent:** Wednesday, December 29, 2021 2:04 PM
**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Thanks Cathryn, for the update.  Let's touch base after your appointment.
Debra

---

**From:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Sent:** Wednesday, December 29, 2021 11:15 AM
**To:** Freedman, Debra <Debra.Freedman@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Debra,

They had to reschedule the appointment for January 7.  My appointment is set for 2:00 p.m. – 3:00 p.m. (CST) on Friday, January 7.  The doctor did a comprehensive allergy test and they are going to go over the results of the tests on Friday, January 7.

3

I will upload the information following my meeting on January 7.

Best,

Cathryn Koepke

**From:** Freedman, Debra <Debra.Freedman@disney.com>
**Sent:** Wednesday, December 29, 2021 1:12 PM
**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Cathryn,

I hope you enjoyed your holiday and vacation.  I'm following up on the note we discussed for a vaccine medical accommodation a couple months ago.  Were you  able to get a note from your medical provider?  I can provide you instructions for uploading the note to our site.

Looking forward to hearing your thoughts,
Debra

*Debra Freedman*
Phone:  818 726-9725

**From:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Sent:** Monday, November 15, 2021 9:20 AM
**To:** Freedman, Debra <Debra.Freedman@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Debra,

It went very well.  They ran a series of prick tests and blood tests.  The results of the blood tests will be on December 10.  That is when they will go over all my allergies specifically related to the vaccine.

Thank you for your follow-up Debra.

Best,

Cathryn

**From:** Freedman, Debra <Debra.Freedman@disney.com>
**Sent:** Monday, November 15, 2021 10:58 AM
**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Cathryn,

I hope you are doing well.  How did your appointment go with the allergist?  Please let us know if you were able to get a note for your vaccine accommodation request.

Thank you,
Debra

*Debra Freedman*
Phone:  818 726-9725

---

**From:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Sent:** Monday, October 25, 2021 7:40 AM
**To:** Freedman, Debra <Debra.Freedman@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Debra,

I hope you are doing well.  I had my first appointment with the allergist at 9:00 a.m. (CST) this morning.  I am Dr. Lisa Sullivan MD SC at 737 Saint John's Avenue, Highland Park IL 60035.

They will be performing a blood skin test on Friday, November 12.   The purpose of the skin test is to evaluate my immune system and my tolerance to the vaccines.

Please do not hesitate to contact me if you have further questions.

Best,

Cathryn Koepke

---

**From:** Freedman, Debra <Debra.Freedman@disney.com>
**Sent:** Thursday, October 21, 2021 11:06 AM
**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Subject:** RE: Cathy Vaccination Accommodation Request

Hi Cathy,

As a follow up to our call, here are links to the COVID-19 vaccine resources put together by our company doctors and safety experts.

https://disney.foleon.com/twdc/moving-forward-together-vaccines/home/

https://twdc.insidedisney.com/covid-19-vaccine-information/

Please let us know if you have any questions.

Kind regards,
Debra

*Debra Freedman*

Phone:  818 726-9725


-----Original Appointment-----
**From:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Sent:** Monday, October 18, 2021 9:01 AM
**To:** Freedman, Debra
**Subject:** Accepted: Cathy Vaccination Accommodation Request
**When:** Monday, October 18, 2021 1:30 PM-2:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** https://disney.zoom.us/j/94830619395?pwd=Q1VRbm9DUmk4WUd2Vy9hTVVZRzExdz09&from=addon

| | |
|---|---|
| **From:** | Koepke, Cathryn <Cathryn.Koepke@disney.com> |
| **Sent:** | Thursday, February 3, 2022 5:10 PM |
| **To:** | Cathy Koepke |
| **Subject:** | FW: Vaccine Accomodation Request |

**From:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Sent:** Thursday, February 3, 2022 4:06 PM
**To:** Koepke, Cathryn <Cathryn.Koepke@disney.com>
**Cc:** Brown, Makisha <Makisha.Brown@disney.com>
**Subject:** RE: Vaccine Accomodation Request

Hi Cathy,

Thank you for your inquiry.  Based on the interactive dialogue with you and careful consideration of the materials and information you submitted in support of your request for a religious exemption, the company concluded that your sincerely held religious beliefs did not prevent you from getting the COVID-19 vaccine.  Please know that this decision was fully reviewed by the appropriate decision-makers and is the company's final decision.

Best,
Marisa

**From:** Koepke, Cathryn
**Sent:** Thursday, February 3, 2022 3:56 AM
**To:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Cc:** Brown, Makisha <Makisha.Brown@disney.com>
**Subject:** FW: Vaccine Accomodation Request

Hi Marisa,

I have also attached for your review the original email that was sent rejecting the religious accommodation.  Please see my email below.

Best,

Cathy

**From:** Koepke, Cathryn
**Sent:** Wednesday, February 2, 2022 8:50 PM
**To:** Dye, Marisa L. <Marisa.L.Dye@disney.com>
**Cc:** Brown, Makisha <Makisha.Brown@disney.com>
**Subject:** Vaccine Accomodation Request

Hi Marisa,

I hope you are doing well. I did want to follow-up with you on why my religious accommodation was denied at Disney. I had sent an email a week ago asking for an explanation and none was never provided.

During our first meeting we had discussed both my health and religious appeal. During our conversation I had stated that I am against having any type of aborted fetuses put into my body and that the mandated vaccines are in direct violation of my religious beliefs. I had also had written a letter stating that and had attached to my appeal. To date I am not sure why my religious appeal was denied and not discussed further.

I have attached for your review copes from the Catholic Church.   The Catholic Church has judged that it is permissible for people to accept (under protest) or reject the use of such vaccines.

I had stated very clearly in our interview that I am strongly against abortion. When I was pregnant with my first child he had a rare disease and the doctors had recommended that I abort my child. I felt so strongly against abortion that I did not agree to the abortion and left that doctor.

Once again I feel very strongly about my religious exemption and do feel that if rejected it could be in direct violation of my Title VII of the Civil Rights Act. I stated very specifically I hold sincere religious beliefs against taking any vaccines, or taking those derived from aborted fetal cell lines.

As we know Title VII prohibits two categories of employment practices. It is unlawful for an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms, conditions or privileges of employment, because of the individual's race, color, **religion,** sex or national origin.

I understood why my medical exemption was denied but never received an explanation as to why my religious exemption was denied by the Accomodation Committee. I would appreciate if I could receive an explanation and understand why one religion is exempted and others are not.

As you can see I really love my job at Disney and want to remain a productive employee with the company. I do not want to lose my employment over a mandated vaccine. I am a good employee that respect the values of this company and truly believe in the end will do the right thing here.

I would appreciate if you could please reconsider my religious exemption and review the attached letters that support my stance on the religious exemption.

I am copying Makisha on this email because tomorrow is supposed to be my last day. I do hope that you can reconsider my position and allow me to stay with the Walt Disney Corporation.

I do look forward to your response to my email as soon as possible.

Best wishes,


**Cathy Koepke**
**(pronouns she/her/hers)**
**The Walt Disney Company | Senior Recruiter, Enterprise Talent Acquisition**
**Corporate/Communications & PR/ESR/Supply Chain & Global Sourcing**
**email: cathryn.koepke@disney.com**
**Mobile: 847 643-6402**



# EXHIBIT S

To whom it may concern,

Based on my understanding of Title VII of the Civil Rights Act, the Emergency Use
Authorization Act, the First Amendment to the United States Constitution, and other federal
and state laws, I choose to exercise my right to demand a religious exemption to the
requirement that I be vaccinated using the Covid-19 shot.  This demand for an exemption is
based on my deeply held religious beliefs pursuant to my reliance on teachings in the Holy
Bible.

The Bible says " if anyone, then, knows the good they ought to do and doesn't do it, it is sin for
them." (James 4:17 NIV). My personal convictions are inspired by my study and understanding
of the Bible, and personally directed by the true and living God. I am personally convicted that I
should not receive any of the three Covid-19 shots presently authorized by the FDA under the
Emergency Use Authorization. Although one of the vaccine shots has been given full approval
by the FDA, the submitted vaccine shot used in the full approval process has a different
ingredient makeup than the vaccine shot on the market right now that is being injected in the
arms of Americans under the Emergency Use Authorization. The new version of the shot is not
in manufacturing yet.

It is not my responsibility to force my personal religious convictions regarding this matter on
other persons as I believe whether to receive a Covid-19 shot is a personal decision to each
person ( Romans 14). Where scripture does not expressly instruct on a particular matter, I
believe that I am required to search the scripture myself for related truths ( Romans 15:4) and
to seek personal guidance from the Holy Spirit ( Acts 2:38-39; Romans 8). If I fail to submit to
the personal convictions that the Holy Spirit and scripture has impressed upon me, I will be
sinning against God. I have personally searched the scripture and sought guidance from the
Holy Spirit to come to my decision.

The Bible states that the body is the Temple of the Holy Spirit. We are commanded to take
good care of it, not to defile it, and certainly not to introduce something into it that could
potentially harm it ( 1 Corinthians 3:16-17, Corinthians 6:19-20, 2 Corinthians 5:10, and 2
Corinthians 7:1).

The Bible also outlines the fact that God created the body both "fearfully and
wonderfully." (Psalms 139:13-16). The Covid-19 shots work as gene therapy. By manipulating
genetic operations, the Covid-19 shots alter what God made (literally assuming the position of
God), which I believe to be a sinful practice under these circumstances. These vaccines (by the
very disclosure of the vaccine manufacturers) contain carcinogens, neurotoxins, animal viruses,
animal blood, allergens, and heavy metals. As the Covid-19 shots are still in the experimental
phase of study, I do not believe it would be right for me to introduce these substances into my
body because they have not sufficiently been proven to me to be safe and effective. Rather, I
believe they may be harmful to my body.

It is worthwhile to provide some context to these assertions by noting that Covid-19 being
untreated, has a survivability rate of 99.98% under 50 years of age. Over 50 the survival rate is
99.5%. These are numbers provided by the CDC. This continues to lend credibility to the fact
that it would be sinful to seek to undertake a superfluous procedure when the risk is
substantially low. Also being the face that I have been tested and proven to have antibodies to
the Covid-19 virus which studies have now proven to be more robust than those produced as a
result of the vaccine and will be produced for life. Therefore, based on guidance from the Holy
Spirit and the Holy Bible, I cannot conscientiously take the Covid-19 shot under these
circumstances.

Perhaps the most notably significant reason why the acceptance of these vaccines would be considered sinful centers around the fact that fetal stem cell lines from aborted babies were used in either the initial development and/or testing of Covid-19 shots.1 By receiving the Covid-19 shots presently available, I believe it would constitute a complicit action in the act of abortion. I believe that abortion is murder and is strictly prohibited in the Bible (Exodus 20:13; Psalms 139:13-16; Jeremiah 1:5; Isaiah 49:15). Psalms 127:3 says that "children are a heritage from the lord, offspring a reward from him." The fact that aborted stem cells were involved in the origination of the three Covid-19 shots makes the consumption of this vaccine an unthinkable act for me.

In addition to the religious exemption demanded, I have the legal right to be exempt from the vaccine mandate based on Federal Food, Drug, and Cosmetic Act.

Some Covid-19 vaccines are merely authorized, not approved or licensed, by the federal government; they are Emergency Use Authorized (EUA) only. The Federal Food, Drug, and Cosmetics Act states that individuals to whose EUA products are administered must be informed—

(I) that the Secretary has authorized the emergency use of the product;
(II) of the significance known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
(III) of the option **to accept or refuse administration** of the product, of the consequences, if any, of refusing administration of the product, and of the Alternatives to the product that are available and of there benefits and risks.

Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III).

Accordingly, the federal court held that the U.S. military could not mandate EUA vaccines to soldiers. Doe #1 v. Rumsfeld, 297 F.Supp.2d 119 (2003). The court held: "...the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." Id. at 135. No court has ever upheld a mandate for an EUA vaccine, nor will they do so with the Covid-19 vaccine which has not been licensed or approved by the FDA.

Date: 9/2/2021.          Signed: _Seth Schmidt_

                         Name (print): Seth Schmidt

Date: 9/5/2021          Pastor's signature: _N. Lij_

                         Pastor (print): William lewis

1 http://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/ COVID-19_Vaccine_Fetal_Cell_Handout.pdf;;
   http://leg.la.gov/assist/oph/Center-PHCH/Center-PH/immunizations/ You_Have_Qs_COVID-19_Vaccine_FAQ.pdf;
http://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Pages/ COVID-19_Vaccine_Fetal_Cell_Handout.p.

# EXHIBIT T

To whom it may concern at the Walt Disney company,

I Seth Schmidt am being pressured by this company to take the vaccine, and my employment and welfare has been threatened, that if I do not take it I will be terminated. I view this as harassment, I view this as me being forced to do this against my own will and my conscience, and I received this command by the Walt Disney company as something that is diametrically opposed to my first amendment rights.

Therefore I am requiring that a representative of the Walt Disney company sign this statement making clear the fact that from the moment I get the vaccine this corporation will be held responsible for any illness or sickness that results from the vaccine from this moment to the day of my death. A copy has been provided to my safe deposit box, to my attorney and to my family in the event of something going on.

Date:_____.                         Signed:_____

                                                Name (print):_____

Date:_____.                         Representative of the Walt Disney company signature


                                           _____